**DORCHESTER GAS PRODUCING COMPANY, Appellant,**

v.

**The HARLOW CORPORATION, et al., Appellees.**

**No. 07–86–0024–CV.**

Court of Appeals of Texas, Amarillo.

July 23, 1987.

Rehearing Denied Sept. 3, 1987.

Broadus A. Spivey and Paul E. Knisely, Spivey, Grigg, Kelly & Knisely, Austin, William J. Lowe and Jerry D. Courtney, Lowe and Courtney, Clarendon, David Martindale, Martindale, Martindale & Harris, Pampa, for Harlow Corp.

Frank Douglass, Tom W. Reavley and Ray N. Donley, Scott, Douglass & Luton, Austin, Hubert D. Johnson, Johnson & Cravens, Dallas, Robert L. Templeton and Robert E. Garner, Templeton & Garner, Amarillo, for Dorchester Gas Producing.

Charles R. Watson, Jr. and D. Patrick Long, Culton, Morgan, Britain & White, Amarillo, Donald M. Hunt, Carr, Evans, Fouts & Hunt, Lubbock, for Hagy.

Leo J. Hoffman, Strasburger & Price, Dallas, for Harrington.

Before REYNOLDS, C.J., and DODSON and COUNTISS, JJ.

DODSON, Justice.

This action presents a title dispute and other controversies between the phase owner of the "gas and gas rights" and the phase owners of the "oil and oil rights" under an oil and gas lease on a section of land located in Gray County. Dorchester Gas Producing Company (hereinafter called "Dorchester") owns the "gas and gas rights" phase. The Harlow Corporation, W.V. Harlow, Jr., individually, and as trustee of the W. Van Harlow, III, Trust Estate, H.G. Cambern, Kenneth Cambern, Eagle Investment Corporation, Rick J. and Cindy Harris, David L. Martindale, Noel Bruce, J.W. Adams, individually and as independent executor of the R.W. and James Adams Estate, Joyce and C.A. Scott, Lynn O'Brien and Fred Vanderburn (hereinafter called "Harlow") own the "oil and oil rights" phase. Lawrence R. Hagy (hereinafter called "Hagy") and Sybil B. Harrington and the Don and Sybil B. Harrington Foundation (hereinafter called "the Harringtons") own overriding royalty interests in the "oil and oil rights" phase. The trial court construed the title document in question, submitted the remaining matters to a jury and rendered judgment resolving all matters in dispute. By a limited appeal, Dorchester challenges certain adverse portions of the judgment. Also, Harlow challenges adverse portions of the judgment and Hagy brings two cross-points of error. We affirm.

Dorchester brought this action against Harlow seeking declaratory relief to establish its title to all of the gas, including casinghead gas, in all formations in and under the property in question and damages for the alleged conversion of its gas. However, Harlow claims that their ownership of the oil and oil rights include casing-

head gas. Harlow maintains that casinghead gas is any gas produced with oil and that they have the right to produce gas from any formation so long as the production has a gas/oil ratio of 100,000 cubic feet or less of gas per barrel of oil. Dorchester also joined Hagy and the Harringtons in the case claiming that those parties aided Harlow in the alleged conversion of Dorchester's gas.

The record shows that Dorchester and its predecessors in interest have been producing gas from the Brown Dolomite formation in and under the property since the late 1940's. After 1979, Harlow drilled and produced oil and casinghead gas from four wells on the land from formations other than the Brown Dolomite formation. However, Harlow perforated their No. 1 and 2 wells in the Brown Dolomite formation (a gas-indigenous formation) and mixed the gas from that formation with the oil and casinghead gas from the other producing formations.

The trial court construed the documents in question and tried the other causes of action raised by the parties' pleadings before a jury. In response to special issues, with corresponding numbers, the jury determined that: (1) Harlow had produced "Dorchester gas" from the property in question;[1] (2) Harlow had produced 187,-125 MCF of Dorchester gas from the property in question; (3) Harlow had received $462,152 from the sale of such gas; (4) Hagy and the Harringtons did not aid or assist Harlow in the production of Dorchester gas from the property in question; and (5) the Brown Dolomite formation as it is found in Harlow's Beavers No. 1 and 2 wells is not productive of native oil under normal operating conditions.

In further response to special issues, with corresponding numbers, the jury determined that: (6) Dorchester had not established title to the entire natural gas leasehold estate in the Brown Dolomite for-

mation under the property in question by adverse possession under the five-year statute of limitations; (7) Dorchester had not established title to the entire natural gas leasehold estate in the Brown Dolomite formation under the property in question under the ten-year statute of limitations; (8) $234,923.53 was the amount of reasonable and necessary attorney's fees for Dorchester for the preparation and trial of this case; (9) the amount of Dorchester's costs for paralegal services was $7,778.33; (10) Harlow's Beavers No. 1 oil well was not producing casinghead gas from the Brown Dolomite formation; and (11) Harlow's Beavers No. 2 oil well was not producing casinghead gas from the Brown Dolomite formation.[2]

The trial court disregarded the jury's answers to special issues numbered eight and nine (for attorney's fees and paralegal services) and rendered judgment on the jury's answers to the other special issues. Accordingly, the trial court rendered judgment that Dorchester take nothing against Hagy and the Harringtons, that Dorchester recover no attorney's fees or paralegal fees, and that Dorchester recover from Harlow the amount of $470,382.11. The trial court further permanently enjoined Harlow from producing any gas from the Brown Dolomite formation under the property in question.

By its limited appeal, Dorchester brings three points of error; Harlow brings thirty-six points of error; and, Hagy brings two cross-points as additional reason for affirming the take-nothing judgment rendered in Hagy's favor on Dorchester's action against him. This appeal presents challenges to: (1) the trial court's construction of the title documents; (2) the trial court's jurisdiction; (3) the trial court's change of venue to Lubbock County; (4) the legal and factual sufficiency of the evidence to support the jury's verdict; (5) the submission of certain issues; (6) the measure of dam-

---

1. The jury was instructed that "Dorchester gas" means all natural gas other than casinghead gas, and that "casinghead gas" means gas or vapor indigenous to an oil stratum and produced from such stratum with oil.

2. In connection with special issues numbered ten and eleven, the trial court instructed the jury that "casinghead gas" means any gas or vapor indigenous to an oil stratum and produced from the stratum with oil.

ages; (7) the trial court's exclusion of certain evidence; (8) the trial court's charge; (9) the joint and several liability rendered in the judgment; (10) the trial court's failure to award attorney's fees; and (11) the trial court's take-nothing judgment as to Hagy and the Harringtons.

## The Title Matter

Dorchester's first point of error and Harlow's first, second, third, fourth, tenth, eleventh and thirty-sixth points of error present the dispute concerning the construction of the title document in question. The oil and gas interest in dispute in this action derives from an "Oil and Gas Mining Lease" dated 21 March 1941, between G.H. Beavers, Linnie D. Beavers, Doris Beavers Mulky, Francis P. Mulky, collectively as lessor, and D.D. Harrington, as lessee. This original "Beavers lease" covered all of Section 117, Block B–2, H & G N Railway Company Survey, Gray County, Texas, the property in question. The record shows that the Beavers lease property became owned one-third each by D.D. Harrington, Lawrence R. Hagy and Stanley Marsh. The Harrington, Hagy and Marsh partnership incorporated under the name of "Panoma Corporation."

On 1 October 1949, the partners (or their successors in interest) assigned the Beavers lease to the Panoma Corporation. On 29 May 1953, the Panoma Corporation made an "Assignment of Oil Rights" to Lawrence R. Hagy. In pertinent part, the assignment provides:

THAT PANOMA CORPORATION, a Delaware corporation, hereinafter called "Assignor", ... does hereby assign, transfer and convey unto LAWRENCE R. HAGY, of Amarillo, Texas, hereinafter called "Assignee", all of its right, title and interest in and to those certain oil, gas and mineral leases situated in Gray County, Texas, which said leases and leasehold estates, the respective interests owned by Assignor therein, and the lands covered thereby are set forth and fully identified in the schedule attached hereto and marked Exhibit "A", *insofar as said leases and leasehold estates cover the oil and oil rights only in and to the producing horizons thereunder which are situated in whole or in part above sea level.*

It is expressly understood that Assignor reserves, excepts and retains unto itself, its successors and assigns, the oil rights under said leaseholds and title to all oil in, under and that may be produced from said premises from all producing horizons which are situated *in whole below sea level*, and *it is further understood that this assignment does not cover or include any right, title or interest with respect to the gas or gas rights in, to and under said leaseholds.* [emphasis added]

The gas in dispute in this case is situated above sea level.

The trial court construed the document in question and found, as a matter of law, that: (1) the conveyances in question are unambiguous; (2) by the use of the term "oil and oil rights" in the 1953 assignment from Panoma Corporation to Lawrence R. Hagy, the parties intended to convey and did convey the ownership of and title to crude petroleum in its natural state in the ground and ownership of and title to and the right to produce casinghead gas; and (3) casinghead gas is defined as "gas and/or vapor indigenous to an oil stratum and produced from such stratum with oil." The trial court further decreed that under the 1953 assignment the ownership of and title to casinghead gas, as defined above, was vested in Lawrence R. Hagy. The record shows that Dorchester became the successor in interest to the Panoma Corporation and that Harlow became the successor in interest to Hagy.

Harlow claims that casinghead gas is any gas produced with oil, that casinghead gas is an oil right, and that under the above Panoma-Hagy assignment, they own any and all gas as casinghead gas from any formation as long as that gas is produced with oil in a gas/oil ratio of 100,000 cubic feet or less of gas to one barrel of oil. Dorchester claims that casinghead gas is a gas and gas right which was specifically excepted and reserved to Dorchester under

the Panoma-Hagy assignment. We disagree with the position of each party.

It is undisputed that the Panoma-Hagy assignment conveyed the "oil and oil rights" to Hagy and reserves to Panoma the "gas and gas rights." The controversy is what was conveyed by the term "oil and oil rights" and what was reserved by the term "gas and gas rights."

In construing the Panoma-Hagy assignment the cardinal rule to be observed is to ascertain and give effect to the real intention of the parties. When the Panoma-Hagy assignment was made and executed, Panoma (when Hagy was a part-owner) had drilled for and was producing natural gas from the Brown Dolomite formation, a gas-indigenous formation under the property in question. At the time the assignment was made the parties knew that the present and future production from the property was and would be subject to the statutory definitions of oil and gas and other related matters such as casinghead gas. In that regard, it is well settled that "[t]he laws which subsist at the time and place of the making of the contract and where it is to be performed ... enter into and form a part of it, as if they were expressly referred to, or incorporated in its terms." *Stanolind Oil & Gas Co. v. Terrell,* 183 S.W.2d 743, 744 (Tex.Civ.App.—Galveston 1944, writ ref'd); *Winder Bros. v. Sterling,* 118 Tex. 268, 12 S.W.2d 127, 128 (Tex.Comm'n App.1929, judgmt adopted); *Kerr v. Galloway,* 94 Tex. 641, 64 S.W. 858, 860 (1901); *Smith v. Elliott & Deats,* 39 Tex. 201, 212 (1873).

When the Panoma-Hagy assignment was made and executed, section 1 of article 6049e [3] provided that "oil" means "crude petroleum oil," "crude petroleum" and

"crude oil"; and that "gas" means "natural gas." Also, article 6008(2)(i) defined "casinghead gas" as any "gas and/or vapor indigenous to an oil stratum *and produced from such stratum with oil*" (emphasis added). Since it is undisputed that at the time the Panoma-Hagy assignment was made, Panoma was, and for a number of years had been producing natural gas from the Brown Dolomite formation by a gas well [4] located on the property in question, it is apparent that Panoma did not intend to sell or convey any of the gas from that formation. In fact, as we view the exception and reservation, Panoma expressed an intent to not convey any gas from not only the Brown Dolomite formation, but any other gas-indigenous formation in and under the property.

By the assignment, Panoma conveyed to Hagy the "oil and oil rights" above sea level on the property in question. As we stated above, by the statutory definitions in effect at the time, "oil" meant "crude petroleum oil," "crude petroleum" and "crude oil." Article 6008(2)(i) defined "casinghead gas" as "any gas and/or vapor *indigenous to an oil stratum* and produced from such stratum with oil." The record before us shows that Panoma and Hagy were experienced and knowledgeable oil and gas producers, they were familiar with the meaning of technical terms used in the oil and gas industry, and they were familiar with the general understandings and commonly accepted customs and practices of that industry. In this connection, it is a well recognized canon of construction that when technical words and terms (*i.e.,* such as "oil and oil rights" and "gas and gas rights") are employed in a contract, the technical words and terms are to be construed by the

---

**3.** *Repealed by* Act of June 15, 1977, ch. 871, § 2(a)(2), 1977 Tex.Gen.Laws 2345, 2689; *see now* Tex.Nat.Res.Code Ann. § 85.001(a)(1), (3) & (4), (b) (Vernon 1978).

**4.** Section 2(d) of article 6008 defined a "gas well" as any well:

 (a) *which produces natural gas not associated or blended with crude petroleum oil at the time of production,* or (b) *which produces more than one hundred thousand (100,000) cubic feet of natural gas to each barrel of*

*crude petroleum oil from the same producing horizon,* or (c) which produces natural gas from a formation or producing horizon productive of gas only encountered in a well bore through which crude petroleum oil also is produced through the inside of another string of casing. [emphasis added]

*Repealed by* Act of June 15, 1977, ch. 871, § 2(a)(2), 1977 Tex.Gen.Laws 2345, 2689; *see now* Tex.Nat.Res.Code Ann. § 86.002 (Vernon 1978).

courts as those terms are usually understood by persons in the profession or business to which the terms relate, unless it is clear that the terms were used in a different sense. *Oil Insurance Ass'n v. Royal Indemnity Co.*, 519 S.W.2d 148, 150 (Tex. Civ.App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.); *Royal Indemnity Company v. Marshall*, 378 S.W.2d 364, 370 (Tex.Civ. App.—Austin 1964), *rev'd on other grounds*, 388 S.W.2d 176 (Tex.1965); *Frost v. Martin*, 203 S.W. 72, 74 (Tex.Civ.App.— Fort Worth 1918, no writ).

■ The record before us shows that at the time the Panoma-Hagy assignment was made, it was the general understanding and commonly accepted custom and practice in the oil and gas industry that casinghead gas was a part of the oil and oil rights, and that such gas was owned by and belonged to the oil and oil rights owner. Since casinghead gas is not mentioned in the assignment, there is no expressed intent to negate the accepted practice of conveying the casinghead gas with the oil and oil rights. Furthermore, in general, the Texas case law holds that casinghead gas is an oil right. *Reynolds v. McMan Oil & Gas Co.*, 11 S.W.2d 778, 784 (Tex. Comm'n App.1928, holding approved).

■ Consequently, when the Panoma-Hagy assignment is viewed in the light of the statutory definition in effect at the time of the conveyance, the fact that Panoma was producing natural gas from the Brown Dolomite formation in and under the property in question, coupled with the general understanding and commonly accepted custom and practice in the oil and gas industry that casinghead gas belonged to the oil owner, which was in accord with the case law at the time, we conclude that Panoma conveyed to Hagy the oil in the oil-indigenous formation or strata in and under the property in question and the casinghead gas (*i.e.*, gas and/or vapor indigenous to an oil stratum and produced from such stratum with oil); and, that Panoma reserved and excepted from the conveyance all of the gas from the Brown Dolomite formation (*i.e.*, the formation it was producing at the time of the conveyance) and all gas from any other gas-indigenous formation in and under the property in question. Thus, we further conclude that the trial court did not err by determining, as a matter of law, that the conveyance in question was unambiguous, that by the use of the term "oil and oil rights" in the 1953 assignment from the Panoma Corporation to Lawrence R. Hagy the parties intended to convey and did convey the ownership of and title to crude petroleum in its natural state in the ground and ownership of and title to and the right to produce casinghead gas, and that "casinghead gas" is defined as "gas and/or vapor indigenous to an oil stratum and produced from such stratum with oil."

We further respond to Harlow's primary contention under their first, second, third, fourth, tenth and eleventh points of error that all of the gas produced from their oil wells on the property is casinghead gas, as a matter of law, even though they have perforated the Brown Dolomite formation and mixed gas from that formation with oil and gas from oil-indigenous formations, since its wells come within the statutory definition of an oil well and produce a gas/oil ratio of 100,000 cubic feet or less of gas per one barrel of oil. Thus, in essence, Harlow seeks to expand the statutory definition of casinghead gas to any gas produced from a well classified as an oil well. We disagree.

■ In this instance, the statutory definition, which was enacted in 1935, controls. Before the statutory definition was enacted by the legislature, the court in *Magnolia Petroleum Company v. Connellee*, 11 S.W.2d 158, 160 (Tex.Comm'n App.1928, judgmt adopted) quoted, with approval, the definition of casinghead gas found in the regulations of the Interior Department which defined casinghead gas as "the gas from an oil well coming through the casing, with the oil from oil producing strata."

We acknowledge that to support its definition of casinghead gas, Harlow relies on a statement in *Read v. Britain*, 422 S.W.2d 902, 903 (Tex.1967), where the Court said: "Casinghead gas is gas produced from an oil well simultaneously with the production of oil." However, when the statement is

viewed in context with the matters before the court in *Read*, it is apparent that the *Read* court did not intend its statement as an abrogation of the statutory definition. Consequently, we disagree with Harlow's expanding definition of casinghead gas because 1) by the statutory definition, casinghead gas is limited to gas and/or vapor indigenous to an oil stratum and produced from such stratum with oil; and 2) the classification of a well as either oil or gas does not determine the ownership of the substance produced from that well. Last, we disagree with Harlow's definition because, in this instance, the ownership of the substance produced from the wells is determined by the pertinent title information, the statutory definitions and the case law in effect at the time of the conveyance in question.

In the case before us, the title to gas in the Brown Dolomite formation is ascertained, as a matter of law, from the court's construction of the Panoma-Hagy assignment. Under the court's construction of that title document, Harlow owns no gas in the Brown Dolomite formation, nor in any other gas-indigenous formation or strata in and under the property. Thus, we overrule Harlow's first, second, third, fourth, tenth, eleventh and thirty-sixth points of error.

We further respond to Dorchester's claims that by the exception and reservation provision in the assignment all gas including casinghead gas in all formations in and under the property were reserved to Panoma Corporation, and reiterate that under the general understanding and accepted practices in the oil and gas industry, casinghead gas (as defined by the statutes in effect at the time of the conveyance) was an oil right. Also, the Texas case law in effect at the time had determined that casinghead gas was an oil right. *Reynolds v. McMan Oil & Gas Co.*, 11 S.W.2d at 784. Furthermore, we again point out that casinghead gas was not specifically mentioned in the exception and reservation provision. Thus, we are not at liberty to extend the provision by adding the unmentioned casinghead gas. The exception and reservation provision is limited to gas and gas rights in gas-indigenous formations, such as the Brown Dolomite formation, in, under and which may be produced from the property in question. Consequently, we overrule Dorchester's first point of error.

*Jurisdiction*

By their fifth and sixth points of error, Harlow maintains that the trial court erred in rendering judgment for Dorchester, and by overruling their amended motion for judgment, motion for judgment notwithstanding the verdict, and motion to disregard the jury's answers to special issues numbered one, two, three, five, ten, and eleven. The court erred, Harlow contends, because the submission of and answers to such issues coupled with the judgment based thereon constitute an impermissible collateral attack upon the Texas Railroad Commission's 1935 order designating the entire Panhandle Field as a common reservoir, and further constitutes an impermissible collateral attack upon decisions within the Texas Railroad Commission's primary jurisdiction and authority to determine classification of their wells as oil wells and to determine the permissible gas/oil ratio in their oil wells. In his brief, under his second cross-point, Hagy adopts Harlow's position and advances that position as another reason to affirm the take-nothing judgment rendered in his favor.

The primary thrust of Dorchester's action against Harlow is to establish its ownership of and title to all of the gas and gas rights in, under, or which may be produced from the property in question, and to recover the value of the gas allegedly converted by Harlow. Dorchester claims ownership and title to all of the gas by virtue of the title documents and adverse possession. In their brief, Harlow concedes that the trial court had jurisdiction to resolve the title dispute between the parties and further asserts that the trial court resolved those matters favorably to them. Thus, Harlow argues that this Court should render judgment for it on the title issues and the remaining actions should be dismissed for lack of jurisdiction or abated for resolution by the Texas Railroad Commission, the

agency of primary jurisdiction, concerning the remaining disputed matters. Although we previously noted that the trial court correctly construed the title instruments, we cannot agree that the Commission's authority extends to the resolution of the remaining disputed matters. We further do not agree that the remaining disputed matters are within the exclusive jurisdiction of the Commission.

It is well settled that the Railroad Commission does not have authority to determine title to land or property rights. *Railroad Commission of Texas v. City of Austin*, 524 S.W.2d 262, 267–68 (Tex.1975). To the same legal effect are: *Jones v. Killingsworth*, 403 S.W.2d 325, 328 (Tex.1965); *Nale v. Carroll*, 155 Tex. 555, 289 S.W.2d 743, 745 (1956); *Ryan Consolidated Petroleum Corp. v. Pickens*, 155 Tex. 221, 285 S.W.2d 201, 207 (1955); and *Magnolia Petroleum Co. v. Railroad Commission*, 141 Tex. 96, 170 S.W.2d 189 (1943). As the Court stated in *Austin:*

> This Court has also held on several occasions that the Commission does not have power to determine title to land or property rights. It is invested with broad powers to determine where, or whether, wells may be drilled, and how much oil or gas may be produced. But it does not have authority to determine the ownership of oil or gas, or how the proceeds from the sale of oil or gas should be apportioned among people who contend that it was, or is, actually being produced from beneath their land. [emphasis added]

524 S.W.2d at 267–68.

The tenor of Dorchester's pleading is not an attack on the classification by the Railroad Commission of Texas. Instead, Dorchester claims for the value of its gas that Harlow has produced and sold without any legal authority to do so. Dorchester's principle complaint against Harlow, other than the title dispute, is that Harlow has con-

verted Dorchester's gas. Conversion is the unauthorized and wrongful assumption and exercise of dominion and control over personal property of another, to the exclusion of or inconsistent with the owner's rights. *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex.1971). In this instance, Dorchester's action for conversion, in essence, treats the alleged unlawful acts of appropriation of Dorchester's gas by Harlow as having divested Dorchester of its title to the gas and Dorchester invokes the aid of the court to secure compensation for the gas by an award of damages in lieu of the gas. *See National Surety Co. v. Odle*, 40 S.W.2d 876, 877 (Tex.Civ.App.—Waco 1931, no writ).

■ We are persuaded that Dorchester's action for damages for the alleged conversion of its gas and related actions are actions which involved the rights to property, that such actions are within the trial court's jurisdiction, and that such actions do not constitute an impermissible collateral attack on the Railroad Commission's designation of the Panhandle Field as a common reservoir or classification of Harlow's wells as oil wells. In *Bolton v. Coats*, 533 S.W.2d 914, 916 (Tex.1975), the Court overruled a similar contention, as advanced in this instance by Harlow, and determined that Bolton's action for royalty payments and for an accounting for crude oil and distillates produced by Coats from a well classified by the Commission as a gas well was not an impermissible collateral attack on the Commission's order refusing to reclassify the gas well.[5] Consequently, we overrule Harlow's fifth and sixth points of error and Hagy's second cross-point.

### Venue

Harlow's twelfth point of error presents our next inquiry. By that point, Harlow maintains the trial court erred by changing the venue of this case to Lubbock County and by denying Harlow's motion for new

---

5. *See also Ortiz Oil Co. v. Geyer*, 138 Tex. 373, 159 S.W.2d 494 (1942), where the Court determined that a lessor or assignee who produced oil contrary to law or commission order is liable to the royalty owner for his share of what is actually, although illegally, produced. In this instance, Dorchester alleged, and the jury determined that Harlow was producing Dorchester's gas from the Brown Dolomite formation, a formation which is not productive of native oil under the section of land in question (*i.e.,* special issue number five).

trial, because Lubbock County was not a county of proper venue under Rule 259, Texas Rules of Civil Procedure.

It is undisputed that the primary thrust of Dorchester's action was to resolve the title dispute to the mineral estate in and under the property in question. That property lies solely in Gray County. Dorchester filed the action in Gray County. However, while the action was pending in Gray County, Dorchester filed a motion under Rule 257, Texas Rules of Civil Procedure, alleging, among other things, that there exists in Gray County so great a prejudice against Dorchester that it could not get a fair and impartial trial in Gray County. Dorchester requested the trial court to change the venue "to any county of proper venue in the same or an adjoining district or to any district where an impartial trial can be had, as provided under Rule 259, T.R.C.P. ..." After a hearing, the trial court concluded that Dorchester could not obtain a fair and impartial trial in Gray County, and transferred the case to the 99th District Court in Lubbock County. Harlow's first objection to Lubbock County as the venue site was by its motion for new trial after the case was tried before a jury and judgment was rendered, in part, on the jury's verdict.

Rule 259, in pertinent part, provides that if a Rule 257 [6] motion is granted, the cause shall be removed:

(a) If from a district court, to any county of proper venue in the same or an adjoining district;

\* \* \* \* \* \*

(c) If (a) and (b) are not applicable, to any county of proper venue;

(d) If a county of proper venue (other than the county of suit) cannot be found, then if from

(1) A district court, to any county in the same or an adjoining district or to any district where an impartial trial can be had.

Harlow claims that Potter County lies in an adjoining district to Gray County, that at least some of the defendants to Dorchester's action reside in Potter County, that Potter County is a county of proper venue, that under Rule 259(a) the case should have been removed to Potter County, and that the trial court committed reversible error by not doing so. We do not agree that Potter County is a county of proper venue in this instance and that the trial court erred by transferring the case to Lubbock County.

■ In the case before us, the title dispute involves real property that lies solely in Gray County. Under Texas Civil Practice & Remedy Code Annotated section 15.-011 (Vernon 1986), an action involving title to real property shall be brought in the county in which all or a part of the property is located. That section is a mandatory venue statute. Since the property in question is located solely in Gray County, that county was the only county of proper venue in this instance by virtue of the mandatory venue statute (*i.e.*, section 15.011). Consequently, when the trial court determined that Dorchester could not obtain a fair and impartial trial in that county, the court had two options under Rule 259(d)— either to remove the case to any county in the same or an adjoining district or to any district where an impartial trial could be had.

Necessarily, Rule 259(d) requires the trial court to exercise discretion in selecting the venue site. Exercising its discretion, the trial court transferred the case to the 99th District Court in Lubbock County. In that regard, we point out that Harlow does not claim in this Court that the trial court abused its discretion by transferring the case to Lubbock County. Nor does Harlow claim that it could not get an impartial trial in Lubbock County. However, we reiterate that Harlow's only contention in this Court is that the trial court erred by transferring the case to Lubbock rather than Potter County, which county Harlow alleges is a county of proper venue in an adjoining district. For the reasons stated, we conclude that Potter County was not a county

---

**6.** Rule 257, Texas Rules of Civil Procedure, provides for change of venue when a party cannot obtain a fair and impartial trial in the county where the case is pending.

of proper venue, that the trial court was not required to apply Rule 259(a) and transfer the case to Potter County, that the trial court had discretion under Rule 259(d) to transfer the case to any district where an impartial trial could be had, and that the record fails to show that the trial court abused its discretion by transferring the case to Lubbock.

■ Furthermore, we conclude that Harlow waived any right to complain of the trial court's change of venue to Lubbock County by failing to timely object to the transfer at a time when the trial court could have corrected the alleged error without substantial interference with the judicial process. It is the general underlying policy of the Texas Rules of Civil Procedure, the statutes and other rules governing the trial and appeal of civil cases, that to preserve alleged error in the trial court, a party must make his objection in the trial court when practicable and at a time when the trial court can correct any error without substantial interference with the judicial process. *Ford Motor Co. v. Nowak*, 638 S.W.2d 582, 598 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.); *Jones v. McSpedden*, 560 S.W.2d 177, 179–80 (Tex. Civ.App.—Dallas 1977, no writ). To permit Harlow to raise their objection to the change of venue to Lubbock County for the first time in its motion for new trial would hinder the efficient administration of justice as the present record demonstrates. Without objection, the venue was changed to Lubbock County long before the case went to trial before a jury. The jury trial consumed approximately four weeks. Thus, we conclude that Harlow's objection to the change of venue to Lubbock County was not timely made. Consequently, for the reasons stated, we overrule Harlow's twelfth point of error.

### Harlow's Challenge to Special Issues Numbered One, Ten and Eleven

By their thirteenth, eighteenth and nineteenth points of error, Harlow challenges the submission of and the legal and factual sufficiency of the evidence to support the jury's answers to special issues numbered one, ten and eleven. By special issue number one, the jury determined that Harlow had produced "Dorchester gas" from the property in question.[7] By special issue number ten, the jury determined that Harlow's Beavers No. 1 oil well was not producing casinghead gas from the Brown Dolomite formation. And, by special issue number eleven, the jury determined that Harlow's Beavers No. 2 oil well was not producing casinghead gas from the Brown Dolomite formation.[8]

■ Under our construction of the Panoma-Hagy assignment, Panoma conveyed to Hagy no right, title or interest in or to any gas from the Brown Dolomite formation (the gas-indigenous formation from which Panoma had been producing for a number of years) or any gas-indigenous formation in and under the property in question. Thus, Harlow had no right to produce gas from the Brown Dolomite formation or any other gas-indigenous formation. Nevertheless, the evidence conclusively shows that Harlow perforated the Brown Dolomite formation in their Beavers No. 1 and 2 oil wells and produced gas from that formation with oil and casinghead gas from oil-indigenous formations. Consequently, when we consider the evidence bearing on special issues numbered one, ten and eleven, we must conclude the evidence is both legally and factually sufficient to support the jury's answers to those issues.[9] Harlow's

7. As mentioned in note 1, *supra*, the jury was instructed that "Dorchester gas" means all natural gas other than casinghead gas, and that "casinghead gas" means gas or vapor indigenous to an oil stratum and produced from such stratum with oil.

8. As mentioned in note 2, *supra*, in connection with special issues numbered ten and eleven, the trial court instructed the jury that "casinghead gas" means any gas or vapor indigenous to

an oil stratum and produced from the stratum with oil.

9. In determining the legal sufficiency challenges, we must review the evidence in the light most favorable to the jury's findings and disregard any contrary evidence to ascertain if there is any probative evidence and reasonable inferences therefrom to support the challenged findings. *Freeman v. Texas Compensation Ins. Co.*, 603 S.W.2d 186, 191 (Tex.1980); *Goodyear*

points of error thirteen, eighteen and nineteen are overruled.

### Harlow's Challenge to Special Issue Number Two

By their seventh, fourteenth and fifteenth points of error, Harlow challenges special issue number two. That issue was conditioned on an affirmative finding (*i.e.*, to special issue number one) that Harlow had produced any Dorchester gas from their Beavers lease. The challenged issue reads: "State the amount of Dorchester gas that has been produced by Defendants from their Beavers lease." The jury answered: "187,125 MCF."

First, Harlow contends that there is no evidence to support the submission of an issue asking the amount of Dorchester gas produced by them from the Beavers lease. In that regard, Harlow contends that the issue should have been limited to gas produced by them from the Brown Dolomite formation from their No. 1 and 2 wells, which were the only matters in dispute. Also, for those same reasons, they claim the issue is immaterial, as a matter of law.

■ Special issue number two is directly related to Dorchester's action for conversion and the issue is material to that action. Because the issue inquires as to Dorchester gas produced by Harlow it does not present cause for disturbing the judgment. In the charge, Dorchester gas was defined as "all natural gas other than casinghead gas." Casinghead gas was further defined as "gas or vapor indigenous to an oil stratum and produced from such stratum with oil." It is undisputed that Harlow perforated its No. 1 and 2 wells in the Brown Dolomite formation (a gas-indigenous formation in which Dorchester owned all of the gas), and produced gas from that formation with some oil and casinghead gas from oil-indigenous formations under the property. Since Dorchester owned all of the gas in the Brown Dolomite formation, the trial court did not err by submitting special issue number two. Likewise, the challenged issue is neither immaterial nor a comment on the weight of the evidence.

■ Harlow further contends that the evidence is factually insufficient to support the jury's answer to the challenged issue (*i.e.*, the jury's answer to special issue number two). In that regard, they claim that the only evidence to support the jury's answer came from Dorchester's reservoir engineer and that the engineer's calculations were purely speculative and were based on a highly dubious assumption that Dorchester would have produced all of that gas from its well if Harlow had not produced the gas. The testimony of Dorchester's reservoir engineer supports the jury's answer. Harlow directs us to no evidence controverting the engineer's testimony. The engineer's testimony is based on information reported to the Texas Comptroller of Public Accounts by Harlow on its No. 1 and 2 wells which were perforated in the Brown Dolomite formation. The evidence shows the daily amount of oil and gas produced from those wells before they perforated the Brown Dolomite formation and the daily amount of oil and gas produced from the wells after they were perforated in the Brown Dolomite formation. The engineer testified that in his opinion, after the wells were perforated in the Brown Dolomite formation, approximately 78.135 percent of the gas produced from the two wells in question came from the Brown Dolomite formation. The engineer's determination of the amount of gas produced by Harlow from the Brown Dolomite formation was calculated on the 78.135 percent figure.

Consequently, when we consider all of the evidence, we must conclude that the evidence is not too weak to support the jury's answer on the challenged issue. Nor is the jury's answer so against the great

---

*Tire & Rubber Co. v. Jefferson Const.*, 565 S.W.2d 916, 918 (Tex.1978); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). However, in determining the factual sufficiency challenges, we must consider all of the evidence favorable and contrary to the challenged findings to ascertain

if the findings are so against the great weight and preponderance of the evidence as to be manifestly wrong or unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 662 (1951); *Traylor v. Goulding*, 497 S.W.2d 944, 945 (Tex.1973).

weight and preponderance of the evidence as to be manifestly wrong or unjust.

 Harlow further contends that the trial court committed reversible error in its charge by placing the burden of proof on them in special issue number two. We disagree. Under the circumstances in this instance, the trial court's placement of the burden of proof was not "such a denial of the rights of the appellant [Harlow] as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case." *See* Tex.R.App. Proc. 81(b)(1). Furthermore, it is well settled that the burden of proof is not necessarily determined by which party happens to be the plaintiff, and that a recognized consideration in determining the burden of proof matters is which party has peculiar knowledge of the facts to be proved. *Jackson v. Green*, 700 S.W.2d 620, 621 (Tex. App.—Corpus Christi 1985, writ ref'd n.r. e.).

In the case before us, it is undisputed that Harlow perforated their No. 1 and 2 wells in the Brown Dolomite formation, commingled gas from that formation with oil and gas from other production formations, and had peculiar knowledge of the gas produced from the respective formations. Consequently, since Harlow was responsible for commingling the gas and was possessed with peculiar knowledge of the amount of gas produced from the respective formations, Harlow was under the burden of establishing with reasonable certainty the amount of gas it produced from the Brown Dolomite formation. *See Humble Oil and Refining Company v. West*, 508 S.W.2d 812 (Tex.1974). Harlow's seventh, fourteenth and fifteenth points of error are overruled.

### *Harlow's Challenges to Special Issue Number Three*

 By their eighth, sixteenth and thirty-fifth points of error, Harlow challenges the submission of and the legal and factual sufficiency of the evidence to support the jury's answer to special issue number three. That special issue and the jury's answer reads: "State from a preponder-

ance of the evidence the amount of money that Defendants have received for the amount of gas indicated in your answer to Special Issue No. 2. Answer in dollars and cents or none. Answer *$462,152.00.*" By these points of error, Harlow primarily contends that the only measure of damages plead and proved by Dorchester was the measure of damages stated in special issue number three, that the only measure of damages Dorchester was entitled to was the market value of the gas, and that the market value of gas is determined by the regulated price at which Dorchester could sell the gas under the terms of the Natural Gas Policy Act of 1978. Thus, in effect, Harlow claims that Dorchester's damages for Harlow's conversion of the gas is limited to the regulated price of gas which Dorchester could have sold the gas for had Dorchester produced the gas, rather than the price Harlow received for the gas in open market.

It is undisputed that the regulated price of gas which Dorchester would have received had it produced and sold the gas is less than the open market price that Harlow received for the gas. Consequently, Harlow argues that Dorchester's measure of damages is limited to the regulated price for which Dorchester could have sold the gas and that they, in essence, are entitled to profits from their wrongful endeavors by limiting the damages to the regulated price rather than the higher open-market price they received for the gas. We disagree.

In conversion cases, there is no absolutely rigid rule of damages applicable to every factual situation. *Minter v. Sparks*, 246 S.W.2d 954, 957 (Tex.Civ.App.—Dallas 1951, writ ref'd n.r.e.). Compensation for the injury is the result to be obtained. *Id.* It is the general rule that where one person converts the property of another and appropriates it to his own use, or sells, or otherwise disposes of the property, the measure of damages is the value of the property converted at the time and place of the conversion, with legal interest. *De Shazo v. Wool Growers Central Storage*

*Co.*, 139 Tex. 143, 162 S.W.2d 401, 404 (1942).

Under the particular circumstances of the case before us, Harlow established the value of the gas by the price it received from the sale of the gas. Furthermore, since a wrongdoer is not allowed to profit from his own wrong, the trial court did not err by refusing to measure the damages by the regulated price which Dorchester could have sold the gas for had it produced the gas. Consequently, we overrule Harlow's contention. In that connection, we point out that we have considered all of the other matters stated in Harlow's eighth, sixteenth and thirty-fifth points of error which are not briefed and further conclude that those matters do not present cause for disturbing the judgment. Harlow's eighth, sixteenth and thirty-fifth points of error are overruled.

### *Harlow's Challenges to Special Issue Number Five*

■ Harlow's points of error nine and seventeen present their challenges to special issue number five. By that special issue, the jury determined that the Brown Dolomite formation as it is found in Harlow's Beavers No. 1 and 2 wells is not productive of native oil under normal operating conditions. Under these two points of error, Harlow primarily contends that the evidence is legally and factually insufficient to support the jury's answer to the challenged issue. We disagree.

The record shows that the jury's answer is supported by evidence from expert witnesses presented by Dorchester. Conversely, Harlow's expert witnesses gave testimony contrary to the jury's answer. In essence, Harlow argues that the jury's answer is against the great weight and preponderance of the evidence primarily because the jury did not accept their witnesses' testimony. Consequently, when we view the evidence in the light most favorable to the jury's answer, we must conclude there is probative evidence to support the challenged finding. Furthermore, when we consider all of the evidence favorable and contrary to the jury's answer, we

must conclude that the jury's answer to the challenged finding is not so against the great weight and preponderance of the evidence as to be manifestly wrong or unjust.

We acknowledge that Harlow claims the challenged issue is immaterial and evidentiary. We have considered these contentions and conclude that they do not present reversible error. Likewise, we have considered their twentieth point of error which was grouped with these points for argument and conclude that that point of error does not present cause for disturbing the judgment. Accordingly, Harlow's ninth, seventeenth and twentieth points of error are overruled.

### *Harlow's Challenges to the Court's Charge*

■ By points of error twenty-nine, thirty, thirty-one and thirty-two, Harlow challenges the court's charge. By their twenty-ninth and thirtieth points, they claim the court commented on the weight of the evidence by using the term "Dorchester gas" in the charge. The term "Dorchester gas" was employed by the court in special issues numbered one through four. The court instructed the jury that the term meant all natural gas other than casinghead gas. The court further instructed the jury that "casinghead gas" was "gas or vapor indigenous to an oil stratum and produced from such stratum with oil." The instructions were in accord with the trial court's title determination, which the court had previously made, as a matter of law, to the effect that Harlow only owned the crude petroleum in its natural state in the ground and casinghead gas indigenous to the oil stratum and produced from such stratum with the oil, and that Dorchester owned all of the other gas under the property in question. As the issues were framed in the charge, it was necessary for the court to instruct the jury in line with the court's determination of the title dispute. The court's instructions did not constitute comments on the weight of the evidence, they simply informed the jury concerning the court's title determination. This, the court could do. Tex.R.Civ.P. 277.

Harlow's twenty-ninth and thirtieth points of error are overruled.

■ By their thirty-first and thirty-second points of error, Harlow claims the trial court erred by refusing to submit their requested definitions of "oil," "gas," "dry gas," "oil well," "gas well" and "common reservoir." If those terms have any relationship to the controversy between the parties, the relation is to the title dispute rather than the conversion action. The trial court made the title determination; the jury was called upon to make factual determinations related to the conversion dispute. The requested definitions were not reasonably calculated to aid the jury in answering the special issues which only related to the conversion action. The requested definitions probably would have served to confuse the jury by injecting title-related matters into the conversion action. Nevertheless, the trial court's failure to submit the requested definitions did not amount to such a denial of the rights of Harlow as was reasonably calculated to cause and probably did cause rendition of an improper judgment in the case. Tex.R.App.Proc. 81(b). Their thirty-first and thirty-second points of error are overruled.

### Harlow's Challenges to Trial Court's Exclusion of Certain Evidence

■ By points of error twenty-one through twenty-eight, Harlow claims the trial court committed reversible error by excluding certain documents and testimony related to: (1) the Texas Railroad Commission rules and regulations; (2) a 1940 Attorney General's opinion; (3) evidence to expand the court's definition of casinghead gas; and (4) evidence of expert witnesses concerning cutting samples from the Dorchester Beavers No. 1 well and the Harlow No. 1 well. By these same points, Harlow also asserts the trial court committed reversible error by instructing the jury in the charge to disregard any evidence concerning any rules and regulations of the Texas Railroad Commission, and by instructing the jury in the charge that the classification of a well by the Texas Railroad Com-

mission does not determine whether gas produced from a well is casinghead gas.

We have examined and considered each of the contentions made under these points of error and conclude that they do not present cause for disturbing the judgment. In the main, each excluded item pertained, as Harlow concedes in part, to a legal issue, which was a matter for the court, not the jury. It follows that the court's action in respect to each contention did not amount to such a denial of the rights of Harlow as was reasonably calculated to cause and probably did cause rendition of an improper judgment in this case. See Tex.R.App.Proc. 81(b). Harlow's points of error twenty-one through twenty-eight are overruled.

### Challenges to Joint and Several Liability

By their thirty-third point of error, Harlow claims that the trial court erred by imposing joint and several liability on W.V. Harlow, Jr. because there is no evidence and no special issue on which to base imposition of such liability on him. We disagree.

■ W.V. Harlow, Jr. is liable as a corporate officer and agent of the Harlow Corporation. It is well established that a corporate officer who commits a tortious action in the course of his corporate duties renders himself personally liable for the act. *Duval County Ranch Co. v. Wooldridge*, 674 S.W.2d 332, 337 (Tex.App.—Austin 1984, no writ). Nor is it necessary that the corporate veil be pierced in order to impose personal liability when the record shows that the corporate officer knowingly participated in the wrongdoing. *Id. See also Barclay v. Johnson*, 686 S.W.2d 334, 336 (Tex.App.—Houston [1st Dist.] 1985, no writ); *Permian Petroleum Company v. Barrow*, 484 S.W.2d 631, 634 (Tex.Civ.App.—El Paso 1972, no writ).

■ In this instance, it is undisputed, admittedly, and the record shows that W.V. Harlow, Jr. formed the Harlow Corporation and served as president of the corporation. He was actively involved in locating and drilling the Harlow wells on the property in

question. He personally reviewed the pertinent geological data and other information before the corporation drilled on the property. He stated that he handled the drilling projects. Most importantly, he made the decision to perforate the Harlow wells in the Brown Dolomite formation. That action resulted in the conversion of Dorchester's gas. Thus, there is ample, undisputed and admission evidence in the record to support the trial court's joint and several judgment against W.V. Harlow, Jr.

■■■ Harlow further contends by their thirty-fourth point of error that there is no evidence that any of the other defendants other than the Harlow Corporation received any money from the sale of any of the alleged Dorchester gas or exercised any dominion or control over such gas. However, W.V. Harlow, Jr. testified that he distributed the proceeds from the sale of production from the Harlow wells to all of the other interest owners. That testimony was not controverted by the other defendants. Thus, we conclude that there is probative evidence to support the trial court's judgment against the other defendants. In that regard, we point out that the judgment against each of the other defendants was limited to their respective individual interest in the Harlow wells. Consequently, we overrule Harlow's thirty-third and thirty-fourth points of error.

### Dorchester's Claim for Damages Against Hagy and the Harringtons

By its second point of error in its limited appeal, Dorchester claims the trial court erred by rendering a take-nothing judgment in favor of Hagy and the Harringtons. In response to special issue number four, the jury determined that Hagy and the Harringtons did not, by their acts and conduct, aid or assist Harlow in the production of Dorchester gas from the Beavers lease. Dorchester does not challenge that jury finding; however, Dorchester now contends that Hagy and the Harringtons are liable to it on two additional theories. The first theory is conversion and the second theory is money had and received. The

record shows, and it is undisputed, that Hagy and the Harringtons own an undivided overriding royalty interest in the working interest of the Harlow wells.

By his first cross-point, Hagy claims the take-nothing judgment in his favor should be affirmed because the trial court erroneously permitted Dorchester to amend its pleadings to add claims for the first time after the jury's verdict and because Dorchester failed to plead, submit issues, or conclusively establish a claim against Hagy for conversion or money had and received. Although the Harringtons' position is stated as counterpoints rather than by a cross-point, their position is the same as Hagy's.

It is well recognized that the trial court does not abuse its discretion by allowing a post-verdict trial amendment to conform the pleadings to the jury's verdict on matters established by the evidence. *Santa Rosa Medical Center v. Robinson*, 560 S.W.2d 751, 759 (Tex.Civ.App.—San Antonio 1977, no writ). However, the trial amendment comes too late when the party desires to plead new and independent grounds of recovery or defenses, that could have been plead earlier and that will prejudice the other party. *Lightner v. McCord*, 151 S.W.2d 362, 367 (Tex.Civ.App.—Amarillo 1941, no writ). *See also BancTexas Dallas, N.A. v. Cornwell*, 683 S.W.2d 104, 106–07 (Tex.App.—Dallas 1984, writ ref'd n.r. e.); *Burroughs Corp. v. Farmers Dairies*, 538 S.W.2d 809, 812–13 (Tex.Civ.App.—El Paso 1976, writ ref'd n.r.e.).

■■■ From the record before us, it is apparent that Dorchester's trial amendment adding the conversion and money had and received grounds of recovery comes too late. Dorchester began this lawsuit by filing its original petition on 13 July 1982. Hagy and the Harringtons intervened in this cause by their Pleas in Intervention filed 8 February 1984. Dorchester went to trial on its third amended original petition which was filed on 29 June 1984; the trial began on 31 July 1984; and, the jury returned its verdict on 30 August 1984. Dorchester filed its trial amendments on 3 December 1984. The judgment appealed from was rendered on 24 October 1985.

Dorchester did not request and the trial court did not submit any issues on conversion and money had and received as to Hagy and the Harringtons. Those actions were mentioned in Dorchester's trial amendments filed approximately three months after the jury returned its verdict. As the Court stated in *Westinghouse Electric Corp. v. Pierce,* 153 Tex. 527, 271 S.W.2d 422, 424 (1954): "[t]he defendants had a right to assume that the case as made by the pleadings and testimony was the case and the only case they were called upon to defend and to prepare their defense accordingly." This, Hagy and the Harringtons did. It was not until approximately three months after Dorchester was confronted with the jury's verdict, that it sought to change the factual basis of its action against Hagy and the Harringtons. In each case, there comes a time when a trial amendment will constitute prejudicial harm to the other party. In this case, three months after the jury verdict was too late. Hagy's first cross-point for affirmance is sustained and Dorchester's second point of error is overruled.

### Dorchester's Claim for Attorney's Fees, Other Services and Fees

By its third point of error, Dorchester claims the trial court erred in disregarding and setting aside special issues numbered eight and nine, which awarded Dorchester attorney's fees and fees for paralegal and investigative services. As the point of error is phrased, Dorchester asserts that the jury awarded it attorney's fees and paralegal services; however, by those special issues, the jury simply determined "the amount of reasonable and necessary attorney's fees for Dorchester Gas Producing Company" and "the amount of Plaintiff's [Dorchester's] costs for paralegal and investigative services in the trial court which should be awarded to it in this suit as being equitable and just...."

 Dorchester's claim for attorney's fees and paralegal services only relate to its claim for declaratory relief. In its conversion action, Dorchester neither requested nor obtained findings that Harlow acted fraudulently or maliciously in converting Dorchester's gas. In the absence of fraud or malice, attorney's fees are not recoverable in a conversion action. *Kilgore Federal Sav. & Loan v. Donnelly,* 624 S.W.2d 933, 938 (Tex.App.—Tyler 1981, writ ref'd n.r.e.). In a declaratory judgment action the statute granted the court discretionary authority to "make such award of cost and reasonable and necessary attorney's fees as may seem equitable and just." Tex.Rev.Civ.Stat.Ann. art. 2524-1 § 10. [Uniform Declaratory Judgments Act, as it appeared in its amended form effective May 25, 1981, ch. 190, § 1, 1981 Tex.Gen. Laws 190, *repealed by* Act of June 16, 1985, ch. 959, § 9, 1985 Tex. Gen.Laws 3242, 3322; *see* Tex.Civ.Prac. & Rem.Code Ann. § 37.009 (Vernon 1986).]

In its declaratory judgment action Dorchester sought to determine that it owned all of the gas including casinghead gas under the property in question by virtue of the record title and, in the alternative, by adverse possession. Dorchester did not prevail on either of these matters. Consequently, we are not persuaded that the trial court abused its discretion by refusing to award Dorchester attorney's fees and paralegal and investigative services. Dorchester's third point of error is overruled.

In sum, we overrule Harlow's thirty-six points of error, Dorchester's three points of error, sustain Hagy's first cross-point, overrule Hagy's second cross-point, and affirm the trial court's judgment.