874 F.2d 1320
 WALKER OPERATING CORPORATION, et al., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Phillips Petroleum Company; Northern States Power
Companies; Lake Superior District Power Company; Natural
Gas Pipeline Company of America; Iowa Public Service
Company; Anadarko Production Company; Pan Eastern
Exploration Company; Inter-City Gas; the Energy Issues
Intervention Office of the Minnesota Department of Public
Service; Northern Natural Gas Company, Division of Enron
Corp.; Colorado Interstate Gas Company; Dorchester Master
Limited Partnership; Mobil Producing Texas & New Mexico
Inc.; Williams Natural Gas Company; Texaco Producing Inc.;
Conoco, Inc., Intervenors.
 Nos. 85-2683, 85-2698, 86-1195 to 86-1201, 86-1204, 86-1205
and 86-1206 to 86-1208.
 United States Court of Appeals,
Tenth Circuit.
 April 28, 1989.
As Amended May 24, 1989.
 
 Jerry D. Courtney, of Lowe & Courtney, Clarendon, Tex., for Stowers Oil & Gas Co., and Walker Operating Corp., Robert J. Kapelke, of Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., with him on the briefs for Walker Operating Corp., and Miles O'Laughlin, of Pampa, Tex., of counsel, with him on the briefs, for Stowers Oil & Gas Co.
 Renea Hicks (Jim Mattox, Atty. Gen., Mary F. Keller, Executive Asst. Atty. Gen. for Litigation, and Larry J. Laurent, Asst. Atty. Gen., on the briefs), Sp. Asst. Atty. Gen., Atty. of Record, for the Railroad Com'n of Texas.
 Edward J. Grenier, Jr., Robert W. Clark, III, and Gail S. Gilman, of Sutherland, Asbill & Brennan, Washington, D.C., for Cabot Pipeline Corp.
 Joe H. Foy, of Bracewell & Patterson, Houston, Tex., for J.B. Watkins.
 Jody G. Sheets, of Gassaway, Gurley, Sheets & Mitchell, Borger, Tex., for Lucky Bird Petroleum, Inc.
 John H. Conway (Catherine C. Cook, Gen. Counsel, and Jerome M. Feit, Sol., with him on the brief), Atty., for the F.E.R.C.
 James L. Trump (Philip R. Ehrenkranz and Paul F. Forshay, of Squire, Sanders & Dempsey, with him on the brief), of Squire, Sanders & Dempsey, Washington, D.C., for Dorchester Master Ltd. Partnership.
 John L. Williford and Jennifer A. Cates, Bartlesville, Okl., for Phillips Petroleum Co.
 P.M. Schenkkan, of Vinson & Elkins, Austin, Tex., for Anadarko Petroleum Corp. and Pan Eastern Exploration Co.
 Paul E. Goldstein, Jerome Mrowca, and Barbara A. Gustafson, Lombard, Ill., for Nat. Gas Pipeline Co. of America.
 Patrick J. McCarthy, of Adams and McCarthy, Omaha, Neb., Frank J. Duffy, Vice President and Gen. Counsel, and Jane G. Alseth, of Northern Nat. Gas Co., Div. of Enron Corp., Omaha, Neb., and George J. Meiburger and Steve Stojic, of Gallagher, Boland, Meiburger and Brosnan, Washington, D.C., for Northern Nat. Gas Co., Div. of Enron Corp.
 Gene R. Sommers, of Northern States Power Co., Minneapolis, Minnesota, for Northern States Power Companies.
 Christopher K. Sandberg, of Atty. Gen.'s Office, St. Paul, Minn., for the Energy Issues Intervention Office of the Minnesota Dept. of Public Service.
 Charles H. Shoneman, of Bracewell & Patterson, Washington, D.C., and David Lindberg, Houston, Tex., for Texaco Producing Inc.
 Before LOGAN, and TACHA, Circuit Judges, and ANDERSON, District Judge.*
 TACHA, Circuit Judge.
 
 
 1
 This case presents for review, pursuant to 15 U.S.C. Sec. 717r(b) and 15 U.S.C. Sec. 3416(a)(4), two orders issued by the Federal Energy Regulatory Commission (FERC). These administrative orders determined that certain oil well operators had violated federal law by the diversion of natural gas dedicated to interstate commerce and by selling that gas at a price in excess of the statutorily established maximum price. We hold that FERC had jurisdiction to issue those orders, that FERC's findings of fact were based upon substantial evidence, that its conclusions of law were reasonable, and that there are no procedural grounds for overturning the orders. We affirm.
 
 I.
 
 2
 The Texas Panhandle is the site of a vast hydrocarbon reservoir, the overlying surface area of which is some 124 miles long and averages approximately twenty miles in width. This reservoir contains both oil-producing and gas-producing formations, with the most significant formation for natural gas production being the brown dolomite. Often, a gas producing horizon overlies an oil producing horizon. Furthermore, when a formation produces both gas and oil, the hydrocarbons constituting oil, being denser than those constituting gas, usually will be found in the lower portions of that formation. Within a specific well, the contact line between the gas zone and the oil zone is referred to as the "gas-oil contact."
 
 
 3
 Within this area, generally referred to as the Panhandle Field, the spacing of oil wells and of gas wells must comply with state regulations that establish specific oil well and gas well proration units. A proration unit here is "[t]he area in a pool that can be efficiently and economically drained by one well, as determined by [the agency regulating production]." H. Williams & C. Meyers, Oil and Gas Terms 777 (7th ed. 1987); see 15 U.S.C. Sec. 3301(8). The Railroad Commission of Texas has designated oil fields by county within the Panhandle Field area and has established ten- or twenty-acre oil proration units for the oil wells in these fields. Likewise, the Railroad Commission has divided the Panhandle Field area into two gas fields, establishing 640-acre gas proration units in the Panhandle West Gas Field and 160-acre gas proration units in the Panhandle East Gas Field. Within the Panhandle Field, the gas rights and the oil rights to the same surface area often are separate leasehold estates held by separate parties. Thus, at times, separate and multiple leasehold estates may apply to the various hydrocarbons produced from a single well bore. See Dorchester Gas Producing Co. v. Harlow Corp., 743 S.W.2d 243, 250-51 (Tex.Ct.App.1987, writ denied).
 
 
 4
 Because a gas proration unit and an oil proration unit can occupy the same surface area, and because of the "split lease" situation, in the Panhandle Field area it is possible--and quite often the case--that the proration units for several oil wells might overlap a single gas well's proration unit, with the oil wells being operated by a different operating company from that operating the gas well. As the Fifth Circuit recently noted, "[w]ith the advent of new drilling and legal strategies, the so-called 'split leases' have now for several years produced a steady flow of gas, controversy, and litigation." Pan E. Exploration Co. v. Hufo Oils, 855 F.2d 1106, 1109 (5th Cir.1988).
 
 
 5
 From its early days the geological and regulatory realities of the Panhandle Field have led periodically to friction between oil producers and gas producers, especially over problems arising from the perforation of oil well casings in a gas-producing horizon above the oil-producing horizon in which the well was completed. The gas producers saw this activity, sometimes called "high perforation," as resulting in production of natural gas to which they held proper title.
 
 
 6
 In the Panhandle Field area, production of oil usually will result in some natural gas also being produced from the oil well. This, in fact, occurs in the area that is the subject of these proceedings, because there the "free gas phase overlies and is in contact with a black oil zone." Stowers Oil & Gas Co., 30 FERC p 63,017, at 65,031 (1985) (recommended decision). At a minimum, this type of gas--from an oil-producing horizon and inevitably produced along with the oil from that horizon--is known as "casinghead gas." The parties here dispute what else is included in that term.
 
 
 7
 The statutory and regulatory structure of Texas oil and gas law recognizes the possibility of gas and oil production from the same well. Texas statutes therefore classify specific producing wells as "oil wells" or as "gas wells" based on a specific well's "gas-oil ratio."[1]
 
 
 8
 In 1983 the FERC enforcement staff began a preliminary investigation into natural gas sales by oil operators in the Panhandle West Gas Field. The investigation focused on the activities of thirty-seven oil well operators whose oil wells and oil proration units were located on the same surface acreage (the subject acreage) as the gas wells and gas proration units of Dorchester Gas Producing Company (Dorchester). In February 1984 FERC issued an order requiring the thirty-seven oil well operators to show cause why they should not be found to have violated section 7(b) of the Natural Gas Act (NGA), 15 U.S.C. Sec. 717f(b), by the diversion of natural gas dedicated to interstate commerce, and section 504(a)(1) of the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. Sec. 3414(a)(1), by selling that gas at a price in excess of the statutorily established maximum price. Stowers Oil & Gas Co., 26 FERC p 61,207, 61,478-80 (1984) (show cause order).
 
 
 9
 A hearing was conducted, and in January 1985 the administrative law judge (ALJ) issued a recommended decision that found thirty-five of the oil well operators in violation of one or both of the statutory provisions. Stowers Oil & Gas Co., 30 FERC p 63,017, at 65,048-49 (1985) (recommended decision). The ALJ found that the evidence against the two remaining operators was inconclusive and required further investigation. Id. at 65,049.
 
 
 10
 In determining whether the operators had sold natural gas at a price in excess of its statutory ceiling price, the ALJ first had to determine whether that gas was being produced from reserves that Dorchester had dedicated to interstate commerce. Any gas produced from a Dorchester gas proration unit is dedicated gas. Although the operators' oil proration units and the Dorchester gas proration units sometimes occupy overlapping surface areas, the ALJ concluded that the Texas regulatory scheme used each well's gas-oil contact to divide the overlying gas proration units from the underlying oil proration units. Therefore, if the operators had produced gas from above the gas-oil contact, they would have been diverting natural gas dedicated to interstate commerce, and, consequently, they would have been selling gas at a higher ceiling price than that allowed by law.
 
 
 11
 The operators claimed that it was ultimately irrelevant whether gas from their wells had been produced from dedicated reserves. They pointed to pricing category determinations made by Texas for most of their wells. Those determinations, they asserted, removed all gas produced by those wells from the statutory ceiling price for dedicated gas. The ALJ concluded, however, that those well determinations covered only the casinghead gas produced by the operators and that, as a practical matter, the Texas definition of casinghead gas covered only that gas produced from below the gas-oil contacts. Therefore, if the operators were producing gas from above the gas-oil contact, they were, in fact, diverting dedicated gas and selling it at a price above its statutory ceiling price.
 
 
 12
 In July 1985 FERC affirmed the ALJ's recommended decision "in its entirety, including all findings of fact and conclusions of law." Stowers Oil & Gas Co., 32 FERC p 61,043, at 61,136 (1985) (opinion no. 239). After FERC issued a subsequent order denying motions for stay and requests for rehearing, Stowers Oil & Gas Co., 33 FERC p 61,207 (1985), the thirty-five operators appealed to this court for review of the Commission's orders. Before this court, the petitioners are those operators together with third parties who have also petitioned for review. Other third parties are present as intervenors, some in support of the petitioners and some in support of the respondent, FERC.
 
 II.
 
 13
 This case requires us to examine the appropriate demarcation of authority between federal and state regulatory agencies. Much of the petitioners' argument on appeal is devoted to the contention that FERC impinged impermissibly upon areas reserved for state regulation and, therefore, attacks the agency's jurisdiction below. Congress, moreover, has directed the reviewing courts to "hold unlawful and set aside agency action ... found to be ... in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. Sec. 706(2)(C). Therefore, before turning to specific judicial review of FERC's findings of fact, its conclusions of law, or its decision, we address this threshold issue of FERC's jurisdiction.
 
 A.
 
 14
 Congress has established a regulatory scheme that allocates specific areas of natural gas regulation to state or to federal regulators. We first examine, therefore, the contours of that regulatory scheme.
 
 
 15
 Prior to congressional action, the Supreme Court held that the "mere force of the commerce clause of the Constitution" barred state agencies from interfering with interstate sales of natural gas. Missouri ex rel. Barrett v. Kansas Natural Gas Co., 265 U.S. 298, 307-08, 44 S.Ct. 544, 545-46, 68 L.Ed. 1027 (1924). In 1938 Congress stepped into the area by enacting the NGA, ch. 556, 52 Stat. 821 (1938) (codified as amended at 15 U.S.C. Secs. 717-717w). "[W]ithout supplanting any of the existing authority of the state agencies, the Act was intended to provide a powerful regulatory partner, the Federal Power Commission, which could regulate activities where the state bodies could not." Corporation Comm'n v. Federal Power Comm'n, 415 U.S. 961, 962, 94 S.Ct. 1548, 1548, 39 L.Ed.2d 863 (1974) (Rehnquist, J., dissenting from summary affirmation).[2] The NGA delineated specific areas as areas of federal regulation or of state regulation. For example, the transportation or sale of natural gas for resale in interstate commerce was affirmatively placed within the federal regulatory sphere, while intrastate commerce in natural gas, and such matters as production or local distribution, were relegated to the state regulatory sphere.[3] Perhaps the most noteworthy area reserved for state regulation was the "production or gathering of natural gas," 15 U.S.C. Sec. 717(b).
 
 
 16
 Although Congress delineated areas of federal and of state regulation, inevitably conflicts developed between the two regulatory spheres. Such conflicts, however, are subject to the principle that the jurisdiction of the states is contingent upon state regulation not intruding into those areas clearly within the sphere of federal regulation. In Northern Natural Gas Co. v. State Corp. Comm'n, 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963), the Supreme Court addressed a state's defense of its regulation on the basis of the production or gathering exemption and noted that "it has been consistently held that 'production' and 'gathering' are terms narrowly confined to the physical acts of drawing the gas from the earth and preparing it for the first stages of distribution," id. at 90, 83 S.Ct. at 649-50. Furthermore, the Court declared:
 
 
 17
 it was settled even before the passage of the Natural Gas Act, that direct regulation of the prices of wholesales of natural gas in interstate commerce is beyond the constitutional power of the States--whether or not framed to achieve ends, such as conservation, ordinarily within the ambit of state power.
 
 
 18
 Id. at 90, 83 S.Ct. at 649-50 (emphasis in original). Finally, the Court held that, after the enactment of the NGA, "[t]he federal regulatory scheme leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas or for state regulations which would indirectly achieve the same result." Id. at 91, 83 S.Ct. at 650 (citation omitted) (emphasis added).[4] The jurisdiction of FERC "was not intended to vary from state to state, depending upon the degree of state regulation and of state opposition to federal control." Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 681, 74 S.Ct. 794, 798, 98 L.Ed. 1035 (1954).
 
 
 19
 Not only must state regulatory action give way if it, directly or indirectly, intrudes into the comprehensive federal regulatory scheme, but it is also true that state regulation under the production or gathering exemption does not bar legitimate federal regulatory action that Congress clearly delegated to FERC. In Colorado Interstate Gas Co. v. Federal Power Comm'n, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206 (1945), the Supreme Court considered an appeal of a federal order fixing new rates for gas transported by two natural gas companies. The Court, addressing the argument that the federal order was barred by the production or gathering exemption, held that the exemption did not preclude the federal agency "from reflecting the production and gathering facilities of a natural gas company in the rate base ... for the purposes of determining the reasonableness of rates subject to its jurisdiction." Id. at 603, 65 S.Ct. at 839-40. Thus, even though "[t]hat treatment of producing properties and gathering facilities has of course an indirect effect on them," the production and gathering clause did not shield those properties or facilities from the consequences of the proper federal regulatory action. Id.
 
 
 20
 Over its first forty years, the NGA regulatory structure--with prices in the interstate market controlled by federal regulation and prices in the intrastate markets largely left to market forces--began to create problems. "[S]hortages in the interstate market developed because gas producers could get higher prices in unregulated intrastate markets." FERC v. Martin Exploration Management Co., 486 U.S. 204, 108 S.Ct. 1765, 1767, 100 L.Ed.2d 238 (1988). In response to this situation, in 1978 Congress enacted the NGPA, Pub.L. No. 95-621, 92 Stat. 3351 (1978) (codified as amended at 15 U.S.C. Secs. 3301-3432).[5]
 
 
 21
 The statutory scheme established by the NGPA divides natural gas production into numerous categories that are distinguished by the date that production began from a well or the particular type of drilling involved. Gas in these categories can be broadly classified as "old" gas, "new" gas, or difficult to produce gas. "Old" gas is generally that produced from wells that had been operating before the passage of the NGPA.... "New" gas is generally that produced from wells that began production after the passage of the NGPA.... Several methods of production are specifically described in the statute as difficult to produce gas.... The categories are not mutually exclusive: a particular sale may be "dually qualified" within a "new" or "old" gas category and also a difficult to produce category.
 
 
 22
 The NGPA established ceiling prices for each of these categories of natural gas production.
 
 
 23
 Martin Exploration Management Co. v. FERC, 813 F.2d 1059, 1063-64 (10th Cir.1987) (citations omitted) (footnotes omitted), rev'd on other grounds, 486 U.S. 204, 108 S.Ct. 1765, 100 L.Ed.2d 238 (1988).
 
 
 24
 With the enactment of the NGPA, some doubt arose whether Congress had "altered those characteristics of the federal regulatory scheme which provided the basis in Northern Natural for a finding of pre-emption." Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd., 474 U.S. 409, 417, 106 S.Ct. 709, 714, 88 L.Ed.2d 732 (1986). The Supreme Court soon dispelled that doubt and held that Congress' shifting of some specific pricing regulation away from FERC and into the control of market forces had not removed that regulation from the "comprehensive federal regulatory scheme." Id. at 422, 106 S.Ct. at 716-17. Consequently, Congress had not "intended to give the States the power it had denied FERC." Id. (reversing judgment of Mississippi Supreme Court that NGPA had vitiated Northern Natural Gas ). Also, because the NGPA's natural gas categories spanned both interstate and intrastate gas, "the NGPA in some respects expanded federal control, since it granted FERC jurisdiction over the intrastate market for the first time." Id. at 421, 106 S.Ct. at 716.
 
 
 25
 In sum, the Supreme Court has narrowly interpreted the exceptions to FERC's jurisdiction over the regulation of natural gas. With this in mind, we turn to FERC's actions in this case to determine whether they impermissibly impinged upon regulatory activities expressly reserved for the state.
 
 B.
 
 26
 "The standard of review on a jurisdictional decision of the FERC is whether the decision was without an adequate basis in law." Alexander v. FERC, 609 F.2d 543, 546 (D.C.Cir.1979), quoted in National Ass'n of Regulatory Utility Comm'rs v. FERC, 823 F.2d 1377, 1382 (10th Cir.1987). A recent Tenth Circuit decision upheld FERC's determination that it had jurisdiction over whether certain gas was dedicated to interstate commerce. National Ass'n of Regulatory Utility Comm'rs, 823 F.2d 1377. In making that decision, this court looked to the statutory language, its interpretation by the Supreme Court, and policy considerations in holding that FERC's interpretation of the congressional intent was reasonable. Id. at 1383, 1385.
 
 
 27
 The petitioners here mount an attack against the statutory jurisdiction of FERC. They contend generally that the production or gathering clause bars FERC from hearing any issues involving such matters as gas-oil ratios, gas-oil contacts, casinghead gas, or high perforations. More specifically, they contend that in this case the integral nature of these "production" issues barred FERC from inquiring into either the scope of Dorchester's natural gas reserves dedicated to interstate commerce or the scope of the Texas pricing determinations covering the petitioners' wells. We disagree.
 
 
 28
 The Commission here was regulating the price ceilings of sales of natural gas in interstate commerce. As the Supreme Court has noted, "sales in interstate commerce for resale by producers to interstate pipeline companies do not come within the 'production or gathering' exemption." Phillips Petroleum, 347 U.S. at 680-81, 74 S.Ct. at 797-98 (stating what Phillips Petroleum Court saw as the "ground" of the decision in Interstate Natural Gas Co. v. Federal Power Comm'n, 331 U.S. 682, 67 S.Ct. 1482, 91 L.Ed. 1742 (1947)).
 
 
 29
 In order to ascertain whether the petitioners had diverted gas dedicated to interstate commerce, FERC had to determine the natural gas reserves that were subject to Dorchester's certificate of public convenience and necessity. Section 7 of the NGA requires a natural gas company to obtain from the Commission "a certificate of public convenience and necessity" prior to engaging in the sale or transportation of natural gas in interstate commerce for resale. 15 U.S.C. Sec. 717f(c), (e).[6] Moreover, once a natural gas company has obtained a certificate of public convenience and necessity, that gas is "dedicated" to interstate commerce, and that producer cannot abandon its supplying of natural gas into interstate commerce, unless the Commission grants it permission to do so, see United Gas Pipe Line Co. v. McCombs, 442 U.S. 529, 536, 542, 99 S.Ct. 2461, 2462, 2469, 61 L.Ed.2d 54 (1979); 15 U.S.C. Sec. 717f(b),[7] or unless that gas falls within the provisions of section 601(a)(1)(B) of the NGPA, see 15 U.S.C. Sec. 3431(a)(1)(B).
 
 
 30
 In 1954 Dorchester acquired Panhandle Field gas reserves[8] and applied for a certificate of public convenience and necessity, which the federal regulatory agency issued on February 6, 1956.[9] That certificate covers the Dorchester gas wells located on gas proration units that overlap the oil proration units of the petitioners. "The initiation of interstate service pursuant to [a] certificate dedicate[s] all fields subject to that certificate." California v. Southland Royalty Co., 436 U.S. 519, 525, 98 S.Ct. 1955, 1958-59, 56 L.Ed.2d 505 (1978). The Dorchester gas, then, was "natural gas committed or dedicated to interstate commerce on November 8, 1978, and for which a just and reasonable rate under the Natural Gas Act was in effect on such date for the first sale of such gas," 15 U.S.C. Sec. 3314(a). See generally Dorchester Gas Producing Co. v. FERC, 571 F.2d 823, 825 (5th Cir.1978); 15 U.S.C. Secs. 717c-717d (granting federal agency jurisdiction under NGA to set "just and reasonable" rates; providing for agency hearings to establish rates). As such, it was subject to the ceiling price established by section 104 of the NGPA. 15 U.S.C. Sec. 3314; see also 18 C.F.R. Secs. 154.1-.310 (1988) (federal regulations establishing and regulating rate schedules and tariffs for natural gas); id. Secs. 271.101(a), 271.401-.403 (1988) (establishing price for NGPA Sec. 104 gas).
 
 
 31
 The ALJ established that Dorchester's certificate of public convenience and necessity applied to--and therefore dedicated to interstate commerce--all natural gas from the subject acreage that was not casinghead gas.[10] Stowers Oil & Gas Co., 30 FERC p 63,017, at 65,046 (1985) (recommended decision). In reaching that conclusion, the ALJ considered the geological characteristics of the Dorchester acreage, the application of Texas state law to that acreage, and a 1952 gas purchase contract that preceded the Dorchester certificate. Id. The ALJ examined these matters only as a necessary background to applying the relevant federal statutes to these parties. Such an examination was therefore within FERC's jurisdiction.
 
 
 32
 Because the petitioners[11] contended that the Texas pricing determinations for their wells have removed all gas produced by those wells from the dedicated gas ceiling price, FERC had to determine the scope of those pricing determinations. Section 103 of the NGPA establishes a ceiling price for "natural gas" statutorily determined "to be produced from any new, onshore production well." 15 U.S.C. Sec. 3313(a).[12] The statutory determination is to be made by the "Federal or State agency having regulatory jurisdiction with respect to the production of natural gas." 15 U.S.C. Sec. 3413(c)(1); see also id. Sec. 3413(a)(1)(C). For the subject acreage, that agency is the Railroad Commission of Texas (RCT). See 18 C.F.R. Sec. 274.501 (1988).
 
 
 33
 When the proceedings below began, most of the petitioners' oil wells had received section 103 determinations from the RCT.[13] The ALJ approached these determinations as administratively final, Stowers Oil & Gas Co., 30 FERC p 63,017, at 65,030 (1985) (recommended decision), and did not attempt to make new section 103 determinations, id. at 65,047; see also 15 U.S.C. Sec. 3413(b); 18 C.F.R. Sec. 275.202 (1988). Instead, the ALJ undertook to ascertain the scope of the section 103 determinations consistent with the federal statutory language, see, e.g., 15 U.S.C. Sec. 3313(c)(3) (barring "new, onshore production well" from being within certain pre-existing proration units). The ALJ concluded that the determinations covered "only casinghead gas." Stowers Oil & Gas Co., 30 FERC p 63,017, at 65,030 (1985) (recommended decision). In order to arrive at that conclusion, she examined Texas state law provisions involving such matters as proration units and casinghead gas. Id. Again, as was the case with the ALJ's examination of the Dorchester certificate of public convenience and necessity, this examination was undertaken only as a necessary background to the application of the relevant federal statutes.
 
 
 34
 We hold that FERC's jurisdictional decisions in these proceedings had an adequate basis in law.
 
 C.
 
 35
 The petitioners contend that, even if FERC had jurisdiction to examine state law issues, it should have abstained from doing so. They assert that FERC should have deferred to Texas authorities on these issues, citing primarily to the principles of Burford-type abstention.
 
 
 36
 Burford-type abstention is deference by a federal court in order to avoid needlessly interfering in state activities. See Burford v. Sun Oil Co., 319 U.S. 315, 317-18, 327, 63 S.Ct. 1098, 1098-99, 1104, 87 L.Ed. 1424 (1943). See generally 17A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 4244 (2d ed. 1988). For several reasons, however, the principles of that abstention should not control this case. First, the procedural posture here is markedly different from the one that caused concern in Burford. Burford involved a federal court's review, under diversity and federal question (due process) jurisdiction, of an RCT order concerning oil well spacing. Burford, 319 U.S. at 316-17, 63 S.Ct. at 1098-99. The federal court's review, moreover, would have preceded any review of the order by the state courts designated to review such orders under Texas law. Id. at 325-28, 63 S.Ct. at 1103-04. Finally, there was no federal statute or regulation at issue in that case.
 
 
 37
 By contrast, the proceedings before FERC involved a federal regulatory agency operating in the area of its expertise. The federal agency was clearly acting within its jurisdiction, and it was taking Texas statutes and regulatory determinations at their face value. A federal regulatory issue was the issue before FERC. This is not Burford, and FERC was not required to have deferred.[14]
 
 III.
 
 38
 We turn next to our review of the federal agency's findings of fact and of its decisions.
 
 A.
 
 39
 The NGA and NGPA explicitly provide the scope of our review for the findings of fact, stating in identical language that "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." 15 U.S.C. Sec. 717r(b) (section 19(b) of the NGA); id. Sec. 3416(a)(4) (section 506(a)(4) of the NGPA). Here, the Administrative Procedure Act provides an identical standard. See 5 U.S.C. Sec. 706(2)(E).
 
 
 40
 "[Substantial evidence] means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216-17, 83 L.Ed. 126 (1938)). That is, "it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939).[15] It is, therefore, "something less than the weight of the evidence," and an agency's finding may meet the standard in spite of "the possibility of drawing two inconsistent conclusions from the evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). This standard "frees the reviewing courts of the time-consuming and difficult task of weighing the evidence, it gives proper respect to the expertise of the administrative tribunal and it helps promote the uniform application of the statute." Id.
 
 
 41
 FERC made findings of fact concerning the geological characteristics of the subject acreage and of the Panhandle Field generally, the events that prefaced the parties obtaining their various leasehold interests and Dorchester obtaining its certificate of public convenience and necessity, and the geological and production realities of the various producing wells on the subject acreage. The petitioners contend that some of these findings are not supported by substantial evidence.
 
 
 42
 Specifically, the petitioners attack the evidentiary sufficiency for the ALJ's finding that they were producing gas from above the gas-oil contact, see Stowers Oil & Gas Co., 30 FERC p 63,017, at 65,048 (1985) (recommended decision). This finding formed a basis for FERC's conclusion that the petitioners were producing dedicated gas from a Dorchester proration unit. The ALJ stated that her basis for that finding was "the totally persuasive evidentiary presentation of the expert witnesses sponsored by [FERC's] Enforcement Staff and Dorchester." Id. The ALJ, furthermore, declared that the presentation's "conclusions, based on accepted scientific principles of geology, chemistry, and reservoir engineering, leave no doubt that most of the gas produced by most of the [petitioners] is not casinghead gas ... and that most of the [petitioners] are producing gas which would otherwise be produced by Dorchester." Id. We find that the ALJ relied on the extensive evidence and arguments presented by the various parties in reaching her recommended decision. See id. at 65,033-43; id. app. C at 65,051-65.
 
 
 43
 The petitioners also object to the ALJ's use of "secondary evidence" to ascertain the gas-oil contact in specific wells. Furthermore, they cite expert testimony that they contend contradicts the expert testimony relied upon by the ALJ. In the final analysis, however, the petitioners' arguments point at best to the presence of some conflicts in the evidentiary record. In the light of our scope of review, that is simply not enough. After a review of the record as a whole, we conclude that the findings of fact are supported by substantial evidence.
 
 B.
 
 44
 The ALJ concluded that the petitioners were producing dedicated gas from Dorchester's reserves and selling that gas at a price above the price ceiling dictated by section 104 of the NGPA. In so concluding, the ALJ examined Texas state law matters involving proration units, contract language, and the definition of casinghead gas. The definition of casinghead gas played a significant role in the ALJ's analysis, for she concluded that the reserves covered by Dorchester's certificate of public convenience and necessity did not include casinghead gas and that the scope of the petitioners' section 103 well determinations was limited to casinghead gas. Therefore, once casinghead gas was defined, it was possible to ascertain whether the petitioners had produced gas dedicated under Dorchester's certificate or within the scope of their own well determinations.
 
 1.
 
 45
 We have concluded that FERC had jurisdiction to examine these state law matters. We have concluded also that FERC need not have deferred to the state agencies or state courts. The petitioners, however, expend considerable energy contending that FERC's interpretation of Texas state law, even if within its jurisdiction, is without foundation.
 
 
 46
 "Unlike factual findings, questions of law are freely reviewable by the courts, and courts are under no obligation to defer to the agency's legal conclusions." Pennzoil Co. v. FERC, 789 F.2d 1128, 1135 (5th Cir.1986). That scope of review is unchanged, of course, when the agency's conclusions of law are based upon relevant state law rather than federal law. See Wolf v. Gardner, 386 F.2d 295, 296 (6th Cir.1967) (court of appeals not required to accept cabinet secretary's conclusions of law based in part on state family law); Baber v. Schweiker, 539 F.Supp. 993, 995 (D.D.C.1982) (mem.) ("substantial evidence" deference "does not attach to an agency's interpretation of state law").
 
 
 47
 Nevertheless, even if not compelling, legal interpretations on a matter by administrative bodies having expertise in the area are "helpful" to reviewing courts, Erickson Air Crane Co. v. United States, 731 F.2d 810, 814 (Fed.Cir.1984), and "the courts are to give some deference to the Commission's informed judgment" on such legal issues, FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 454, 106 S.Ct. 2009, 2015, 90 L.Ed.2d 445 (1986). Generally, then, when a court reviews an agency's careful and studied conclusions of law pertaining to a matter clearly within the agency's expertise, the court will affirm those conclusions if they are reasonable, cf. Chapman v. United States, Dept. of Health & Human Servs., 821 F.2d 523, 527 (10th Cir.1987) (agency's interpretation of statute entrusted to its administration limited to whether construction is "reasonable"), although an agency's "order may not stand if the agency has misconceived the law," SEC v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943).
 
 2.
 
 48
 The petitioners contend primarily that FERC erred in its conclusion concerning the definition of casinghead gas under Texas state law. The petitioners take the position that all gas produced from an oil well is casinghead gas. For the petitioners, then, the crucial distinction is the state statutory classification of wells into "oil wells" or "gas wells." For this position, "any well that produces one barrel or more of oil to each 100,000 cubic feet of gas," Tex.Nat.Res.Code Ann. Sec. 86.002(6) (Vernon 1978), is an oil well, and any gas produced from that well is casinghead gas.
 
 
 49
 The Texas statutory definition of "casinghead gas" is "any gas or vapor indigenous to an oil stratum and produced from the stratum with oil," id. Sec. 86.002(10). Although on its face this definition is consistent with FERC's position, the petitioners argue that their position is the correct interpretation of the legislative intent behind the statute. They point emphatically to a 1940 opinion of the Attorney General of the State of Texas, Tex.Att'y Gen.Op. No. 0-1760 (1940), which concludes that "the term 'casinghead gas' applies to all gas produced from any 'oil well' as defined in [the Texas statutes]," id. at 4. The petitioners contend that Texas law has consistently followed this definition, as illustrated by RCT documents and by such Texas court decisions as Read v. Britain, 422 S.W.2d 902 (Tex.1967).
 
 
 50
 FERC contends that the Texas state law definition of casinghead gas is that found upon the face of the statute. In addition, FERC points to the fact that the RCT regulations--presumably meant to clarify any interpretative problems found in the statute's plain language--virtually repeat the statutory language. The RCT regulations define casinghead gas as "[a]ny gas or vapor, or both, indigenous to an oil stratum and produced from such stratum with oil." Tex.Admin.Code tit. 16, Sec. 3.69 (1986) (RCT; Oil and Gas Div.; definitions). Finally, the ALJ also noted the administrative hearing had shown "this definition [to be] supported by persuasive expert scientific and engineering testimony." Stowers Oil & Gas Co., 30 FERC p 63,017, at 65,046 (1985) (recommended decision).
 
 
 51
 In determining whether gas was "produced from the stratum with oil," the ALJ referred to the gas-oil contact point. Id. at 65,048. The ALJ determined that "Dorchester's proration unit is that portion of the reservoir above the gas-oil contact which lies beneath each 640-acre unit assigned to a Dorchester well." Id. (emphasis added). The ALJ concluded that gas production coming from above the gas-oil contact is not casinghead gas and, therefore, is gas dedicated to interstate commerce. Id.
 
 
 52
 In examining whether it was reasonable for FERC to have adopted its position, we note that although the authority for that position may not be unopposed, it is certainly well represented in Texas law. In addition to the statutory and regulatory language already quoted, there is virtually overwhelming support for FERC's definitional position in Texas judicial opinions handed down after FERC issued its orders. See Amarillo Oil Co. v. Energy-Agri Prods., Inc., No. C-6649, 32 Tex.Sup.Ct.J. ---, ---- (Mar. 8, 1989; slip op. at 12) (holding that "the statutory definition of casinghead gas is not ambiguous"); Dorchester Gas Producing Co. v. Harlow Corp., 743 S.W.2d at 250-51, 258 (upholding instruction charging jury that "the classification of a well by the Texas Railroad Commission does not determine whether gas produced from a well is casinghead gas"). The Texas statutes and regulations, moreover, as a whole are consistent and harmonious with FERC's position. See, e.g., Tex.Nat.Res.Code Ann. Secs. 86.093, 86.097 (Vernon 1978); Tex.Admin.Code tit. 16, Secs. 3.10(a), 3.13(a)(1), 3.13(b)(4)(B), 3.69 (1986); RCT, Special Rules Governing the Panhandle District, II, at rules 1-3 (drilling rules).
 
 
 53
 FERC's position finds further support in a recent order of the RCT establishing and clarifying regulations designed in part to prevent improper production of gas, by oil well operators, from horizons that produce only gas. See Final Order Adopting and Clarifying Rules and Regulations for the Panhandle Fields, RCT, Oil & Gas Docket No. 10-87,017 (Jan. 11, 1989).[16] The RCT adopted verbatim the Texas statutory definition of casinghead gas. Id. at 7. Also, the RCT found that "[o]perators can generally use information" from several sources "in an attempt to determine the gas-oil contact in an individual oil well; but the contact cannot always be determined, and can vary substantially across the field." Id. at 4.
 
 
 54
 The fact that the gas-oil contact point cannot always be precisely determined apparently led the RCT to state that "regulation of the field is best implemented without reference to an absolute gas-oil contact level," id. at 13. The petitioners contend that this language precludes FERC from using the gas-oil contact to determine whether gas being produced was dedicated gas. We disagree. The RCT order merely states a preference, for practical reasons, for regulation constructed without referencing a gas-oil contact. In fact, "[t]he [RCT] has zoned the Panhandle Field reservoir(s) into separate gas fields and oil fields" and "[RCT] field rules require that an oil well be perforated only in levels, sands or strata productive of oil." Id. at 5. This example of the RCT's continued recognition of separate producing horizons is consistent with the concept of a gas-oil contact. We hold that it was reasonable in this case for FERC to have used a gas-oil contact in determining whether dedicated gas was being sold.
 
 
 55
 We find overwhelming support for the reasonableness of FERC's definitional position. Not only is that position supported by the sources we have noted, but many of the sources cited by the petitioners are inconclusive or ambiguous. Cf. Dorchester Producing Co. v. Harlow Corp., 743 S.W.2d at 250-51 (addressing statement found in Read v. Britain, 422 S.W.2d 902, 903 (Tex.1967), concerning casinghead gas). For example, the 1940 Attorney General's opinion states that "[t]he statutory classifications of 'sour gas' and 'casinghead gas' are not absolutely clear," Tex.Att'y Gen.Op. No. 0-1760, at 2, but reasons that the legislature intended "to restrict the term 'casinghead gas' to gas which is produced with oil from an 'oil well,' " id. at 3. The opinion also states, however, that "the Legislature evidently considered that where gas is produced as a necessary incident to the production of oil from an oil well, the value of the oil produced would warrant the use of the casinghead gas 'for any beneficial purpose.' " Id. at 4 (emphasis added). Such statements, together with the opinion's definition of casinghead gas as "gas produced with oil from an oil well," id. at 3, demonstrate the ambiguity of the opinion as it was cited by the parties before FERC. Furthermore, after FERC had concluded its proceedings, the Texas Supreme Court explicitly disapproved the opinion, on the grounds that it failed to follow the plain meaning of the statutory definition of casinghead gas. See Amarillo Oil, 32 Tex.Sup.Ct.J. at --- (slip op. at 12).
 
 
 56
 Upon review, we find that FERC's conclusions of state law, including the Texas state law definition of casinghead gas, are reasonable.
 
 C.
 
 57
 The petitioners also contend that FERC erred in its conclusion that casinghead gas was the only natural gas covered by the section 103 well determinations for the petitioners' oil wells.
 
 1.
 
 58
 RCT made those well determinations pursuant to sections 503(a)(1)(C)[17] and 503(c)(1)[18] of the NGPA. As such, they determined that the petitioners' applicable wells were "new, onshore production wells" within the meaning of section 103 of the NGPA and that, consequently, natural gas produced under section 103 from those wells was subject to the ceiling price set by the NGPA for such gas. See 15 U.S.C. Sec. 3313. The petitioners contend that all natural gas subsequently produced by those wells is removed from FERC's jurisdiction by section 601(a)(1)(B)(iii) of the NGPA. That section provides that the jurisdiction of FERC under the NGA
 
 
 59
 shall not apply solely by reason of any first sale of natural gas which is committed or dedicated to interstate commerce as of November 8, 1978, and which is--
 
 
 60
 ....
 
 
 61
 (iii) natural gas produced from any new, onshore production well (as defined in section 3313(c) of this title).
 
 
 62
 Id. Sec. 3431(a)(1)(B)(iii) ("section 3313(c) of this title" is Sec. 103(c) of the NGPA).
 
 
 63
 FERC affirmed the ALJ's conclusion that the section 103 well determinations did not remove any dedicated gas from FERC's NGA jurisdiction. Although the petitioners at times characterize that conclusion as an erroneous interpretation of state law, in fact section 103 determinations have their legal significance as part of the federal regulatory structure of the NGPA. The ALJ approached the section 103 determinations as valid and administratively final. The ALJ simply applied the principles and provisions of the NGPA to the well determinations.
 
 
 64
 FERC arrived at its conclusion by examining the statutory requirements of a section 103 determination and applying those requirements to RCT's determination affecting the petitioners' wells. Section 103 of the NGPA establishes the ceiling price for natural gas produced by a "new, onshore production well," 15 U.S.C. Sec. 3313(a), (b), and section 103(c) states that, for the purposes of section 103
 
 
 65
 the term "new, onshore production well" means any new well (other than a well located on the Outer Continental Shelf)--
 
 
 66
 (1) the surface drilling of which began on or after February 19, 1977;
 
 
 67
 (2) which satisfies applicable Federal or State well-spacing requirements, if any; and
 
 
 68
 (3) which is not within a proration unit--
 
 
 69
 (A) which was in existence at the time the surface drilling of such well began;
 
 
 70
 (B) which was applicable to the reservoir from which such natural gas is produced; and
 
 
 71
 (C) which applied to a well (i) which produced natural gas in commercial quantities or (ii) the surface drilling of which was begun before February 19, 1977, and which was thereafter capable of producing natural gas in commercial quantities.
 
 
 72
 Id. Sec. 3313(c). The statute therefore provides that a section 103 well cannot be located within a preexistent proration unit[19] which applies to the same reservoir[20] from which the section 103 well produces its natural gas, and which applies to a well that produced natural gas in commercial quantities (or at least that was begun before February 19, 1977, and sometime later became capable of producing natural gas in such quantities).
 
 
 73
 The Dorchester gas proration units in the Panhandle Field predated the petitioners' section 103 wells and were producing natural gas. Furthermore, if the petitioners' wells were producing gas from within a Dorchester proration unit, they would be "within a proration unit ... which was applicable to the reservoir from which [the petitioners'] natural gas is produced." Id. Sec. 3313(c)(3). The petitioners' section 103 wells, therefore, could not be within a Dorchester proration unit, although the surface areas of the Dorchester gas proration units and of the petitioners' oil proration units overlap. By following that analysis, the ALJ concluded that the petitioners' section 103 determinations were applicable only to natural gas produced by the petitioners' oil wells from below the gas-oil contact. Stowers Oil & Gas Co., 30 FERC p 63,017, at 65,047 (1985) (recommended decision). The RCT had declared that its section 103 determinations for the petitioners' wells were made in compliance with all applicable statutory requirements. In reaching her conclusion, the ALJ took the RCT at its word and considered the statutory requirements to have been met.
 
 2.
 
 74
 The petitioners contend that the section 103 well determinations cover all natural gas produced by their wells, even if those wells are deemed to be within a previously existing Dorchester gas proration unit. The petitioners arrive at this conclusion by pointing to the statutory language defining "proration unit" under the NGPA. That definition ties a proration unit to the part of a reservoir that will be "effectively and efficiently drained by a single well." 15 U.S.C. Sec. 3301(8). The federal regulations provide, furthermore, that the jurisdictional agency may make a finding that a well, the drilling of which is begun on or after February 19, 1977,[21] is needed "to effectively and efficiently drain" a portion of an already existing proration unit. 18 C.F.R. Sec. 271.305(b)(1). Section 103 pricing categories may apply to natural gas produced by a well that is covered by such a finding. Id. Secs. 271.301, 271.305(b)(1). Here, that agency, the RCT, stated that the petitioners' section 103 determinations met all the applicable statutory requirements. The petitioners argue, therefore, that the RCT made an implicit finding that the petitioners' wells were needed in order to drain existing Dorchester proration units effectively and efficiently. We disagree.
 
 
 75
 The petitioners' section 103 wells were oil wells. It is unreasonable to interpret a section 103 determination for an oil well as implicitly making a finding concerning the drainage of a Dorchester gas proration unit. Further, the federal regulations clearly state that
 
 
 76
 the jurisdictional agency must explicitly find that the well is necessary to effectively and efficiently drain a portion of the reservoir covered by the proration unit which cannot be effectively and efficiently drained by any existing well within the proration unit. This explicit finding must be based on appropriate geological and engineering data and such data must be included in the notice of determination submitted to the Commission.
 
 
 77
 Id. Sec. 271.305(b)(1) (emphasis added); see Stowers Oil & Gas Co., 33 FERC p 61,207, at 61,421 n. 36 (1985) (order denying stay and rehearing).[22] Here, no such explicit finding was made.
 
 3.
 
 78
 As FERC noted in its order denying motions for stay and requests for rehearing, "[i]t is clear from the legislative history that the section 103 price was not intended to apply to gas that could be produced by an existing well." Stowers Oil & Gas Co., 33 FERC p 61,207, at 61,421 (1985). Senator Pearson stated, during floor debate on the NGPA, that section 103 prices were meant to apply only to "natural gas sold from new reservoirs and new extensions of reservoirs." 123 Cong.Rec. 30,373 (1977), quoted in Stowers Oil & Gas Co., 33 FERC p 61,207, at 61,421 (1985) (order denying stay and rehearing). "The economic incentives ... should only be applicable to truly new gas discoveries." Id., quoted in Stowers Oil & Gas Co., 33 FERC p 61,207, at 61,421 (1985) (order denying stay and rehearing).
 
 
 79
 Section 103 operates to prevent the petitioners from obtaining a section 103 price for natural gas produced from an existing Dorchester proration unit. The petitioners are entitled to a section 103 price for gas produced by their section 103 oil wells only when that gas is produced from their oil proration units and is therefore casinghead gas, that is gas "indigenous to an oil stratum and produced from the stratum with oil." Tex.Nat.Res.Code Ann. Sec. 86.002(10). Such gas will be from below the gas-oil contact and will not be part of Dorchester's dedicated reserves. We affirm the conclusions of law utilized by FERC in reaching its decision.
 
 D.
 
 80
 In addition to a review of the agency's findings of fact and conclusions of law, judicial review of agency action also entails an examination of the agency's reasoning process. The Supreme Court has declared that "the generally applicable standards of [5 U.S.C.] Sec. 706 require the reviewing court" to determine that the agency's "actual choice" was not "arbitrary [and] capricious." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); accord Bowman Transp., Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974) (noting that "though an agency's finding may be supported by substantial evidence ... it may nonetheless reflect arbitrary and capricious action"); Pennzoil Co. v. FERC, 789 F.2d at 1139 n. 31 (citing 5 U.S.C. Sec. 706(2)(A) for "arbitrary and capricious" standard in reviewing "agency decision"). The Court has stated that:
 
 
 81
 The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 245-246, 9 L.Ed.2d 207 (1962). In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."
 
 
 82
 Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866-67, 77 L.Ed.2d 443 (1983) (quoting Citizens to Preserve Overton Park, 401 U.S. at 416, 91 S.Ct. at 823-24).
 
 
 83
 Applying this standard to FERC's orders, we find an extensive examination of "the relevant data" and a clearly articulated "rational connection" between the agency's findings and its final decision. We affirm FERC's orders upon review.
 
 IV.
 
 84
 Finally, we address a procedural issue raised by the petitioners. On February 15, 1984, FERC issued its show cause order against those petitioners that operated oil wells on the subject acreage. Stowers Oil & Gas Co., 26 FERC p 61,207 (1984). The petitioners contend that the show cause order did not give them adequate notice of the theory under which FERC would proceed. According to the petitioners, the order "was premised on the existence of two separate and identifiable producing formations in the West Panhandle Field": a "dry gas" producing zone coterminous with the brown dolomite formation, and an "oil stratum" from which "casinghead gas" was produced. The petitioners assert that FERC continued under this theory up to the point of its offering rebuttal evidence before the ALJ. At that point, they argue, the enforcement staff presented a new theory of the case: one based upon a state law division of the Panhandle Field along a horizontal gas-oil contact, with gas proration units located above the gas-oil contact and oil proration units located below it.
 
 
 85
 The petitioners' contention overstates the case. The show cause order properly stated that it "neither makes findings of fact nor reaches conclusions of law with regard to the [petitioners'] alleged acts and practices." Id. at 61,480. The order, furthermore, asserted that "[t]he brown dolomite stratum is productive only of dry gas at the level at which the operators of each of the oil wells ... have perforated or have caused the perforation of such oil wells." Id. at 61,478 (emphasis added). In its order denying the motions for stay and the requests for rehearing, FERC declared that "the show cause order set the inquiry broadly enough to encompass the concept of the gas-oil contact." Stowers Oil & Gas Co., 33 FERC p 61,207, at 61,423 (1985). We agree.
 
 V.
 
 86
 FERC had jurisdiction to consider those matters examined by it in the adjudicatory hearing. FERC's findings of fact are based on substantial evidence, and its conclusions of law are reasonable. We find no procedural grounds for overturning the orders. FERC's orders are therefore AFFIRMED.
 
 
 
 *
 Honorable Aldon J. Anderson, Senior United States District Judge for the District of Utah, sitting by designation
 
 
 [1]
 The gas-oil ratio is "[t]he number of cubic feet of gas produced per barrel of oil produced." H. Williams & C. Meyers, Oil and Gas Terms 398 (7th ed. 1987)
 The Texas statutory definition of gas well provides that:
 "Gas well" means a well that:
 (A) produces gas not associated or blended with oil at the time of production;
 (B) produces more than 100,000 cubic feet of gas to each barrel of oil from the same producing horizon; or
 (C) produces gas from a formation or producing horizon productive of gas only encountered in a well bore through which oil also is produced through the inside of another string of casing.
 Tex.Nat.Res.Code Ann. Sec. 86.002(5) (Vernon 1978). The statutory definition of oil well provides that: " 'Oil well' means any well that produces one barrel or more of oil to each 100,000 cubic feet of gas." Id. Sec. 86.002(6).
 
 
 [2]
 The NGA named the Federal Power Commission as the federal agency responsible for the enforcement of the Act. See 15 U.S.C. Secs. 717a(9), 717l -717o, 717s. In 1977 FERC assumed those enforcement responsibilities. See 42 U.S.C. Secs. 7172(a), 7341
 
 
 [3]
 Section 1(b) of the NGA establishes the state and federal regulatory areas. That section states:
 (b) The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of--natural gas. 15 U.S.C. Sec. 717(b).
 
 
 [4]
 Then-Justice Rehnquist's dissent from summary affirmation, in Corporation Comm'n v. Federal Power Comm'n, 415 U.S. 961, 94 S.Ct. 1548, 39 L.Ed.2d 863 (1974), provides a decidedly forceful comment on the practical decline of the states' power under the NGA. The comment is also a poetic one. Noting that "the state regulatory agencies were among [the NGA's] strongest supporters," id. at 962, 94 S.Ct. at 1548 (Rehnquist, J., dissenting), Rehnquist recalls the following limerick:
 "There was a young lady from Niger
 Who smiled as she rode on a tiger.
 They returned from the ride
 With the lady inside,
 And the smile on the face of the tiger."
 Id. at 961 (Rehnquist, J., dissenting). Justice Rehnquist then states that, given recent case law concerning the NGA, "the state regulatory agencies must surely feel a special kinship with the young lady from Niger." Id. at 962, 94 S.Ct. at 1548 (Rehnquist, J., dissenting).
 
 
 [5]
 The NGPA named FERC as the federal agency responsible for the enforcement of the Act. See 15 U.S.C. Secs. 3301(24), 3411, 3414(b)
 
 
 [6]
 Section 2 of the NGA defines a "[n]atural-gas company" as "a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale." 15 U.S.C. Sec. 717a(6)
 
 
 [7]
 Section 717f(b) of title 15 of the United States Code states:
 (b) No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.
 15 U.S.C. Sec. 717f(b).
 
 
 [8]
 As the Fifth Circuit stated in reference to this same date and transaction:
 At the time of the acquisition, Dorchester Gas Producing Company did not exist. The acquiring party was Dorchester Corporation, and Dorchester Gas Producing Company was formed to hold the gas reserves in question here sometime after their acquisition. For the purposes of this case, there is no functional difference between Dorchester Corporation and Dorchester Gas Producing Company, and we shall use the name "Dorchester" throughout ... in order to avoid confusion.
 Dorchester Gas Producing Co. v. FERC, 571 F.2d 823, 825 n. 1 (5th Cir.1978).
 
 
 [9]
 The certificate was based on a 1952 gas purchase contract executed by Dorchester's predecessor in interest in its leasehold estate. Stowers Oil & Gas Co., 30 FERC p 63,017, at 65,046 (1985) (recommended decision). On June 7, 1954, when the federal agency began regulating interstate gas sales for resale by independent producers, the sales under the 1952 contract had triggered automatically the dedication of the gas reserves under part of the subject acreage. Id. at 65,033, 65,034
 
 
 [10]
 Again, we examine at this point only whether the ALJ--and, consequently, FERC through its subsequent affirmation--had statutory jurisdiction to delve into matters claimed by the petitioners to be shielded from any federal involvement. We shall take up below an examination into whether FERC's conclusions of law were, in fact, reasonable
 
 
 [11]
 As we have noted, the petitioners in this case are the oil well operators found by FERC to have violated federal law, together with some third parties that side with those operators. For the sake of convenience, we refer here to "the petitioners' wells" as meaning those wells operated by the original thirty-five operators that FERC found to have violated federal law
 
 
 [12]
 Section 103(c) of the NGPA states:
 For purposes of this section, the term "new, onshore production well" means any new well (other than a well located on the Outer Continental Shelf)--
 (1) the surface drilling of which began on or after February 19, 1977;
 (2) which satisfies applicable Federal or State well-spacing requirements, if any; and
 (3) which is not with a proration unit--
 (A) which was in existence at the time the surface drilling of such well began;
 (B) which was applicable to the reservoir from which such natural gas is produced; and
 (C) which applied to a well (i) which produced natural gas in commercial quantities or (ii) the surface drilling of which was begun before February 19, 1977, and which was thereafter capable of producing natural gas in commercial quantities.
 15 U.S.C. Sec. 3313(c).
 
 
 [13]
 Of the 196 oil wells the petitioners operated on the subject acreage, all but 10 were collecting Sec. 103 prices for their gas. Stowers Oil & Gas Co., 30 FERC p 63,017, at 65,030 (1985) (recommended decision). The remaining 10 wells were collecting Sec. 109 prices for their gas. Id. "Section 109 allows ceiling prices for new natural gas that does not fit into a designated category." Id. Although Sec. 109, unlike Sec. 103, does not require an agency determination under the NGPA for the producing well, see 15 U.S.C. Sec. 3413(a)(1), it would still, of course, be a violation of federal law to sell what is legally Sec. 104 gas, and is not Sec. 109 gas, at a higher price reserved for Sec. 109 gas
 
 
 [14]
 In actuality, FERC did stay its proceedings in order to give the RCT time to decide certain state law issues. Stowers Oil & Gas Co., 32 FERC p 61,043, at 61,134-36 (1985) (opinion no. 239). FERC deferred action on Stowers until the RCT had completed action in a different proceeding before it and had voted to issue a memorandum to operators in the Panhandle West Gas Field. Id. at 61,136. FERC concluded that the RCT memorandum supported the conclusions reached by the ALJ. Id
 
 
 [15]
 The Court, in citing these same cases, has stated that "[a]lthough these two cases were decided before the enactment of the Administrative Procedure Act, they are considered authoritative in defining the words 'substantial evidence' as used in the Act." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 n. 18, 86 S.Ct. 1018, 1026 n. 18, 16 L.Ed.2d 131 (1966)
 
 
 [16]
 The RCT order is not final for administrative purposes until: (1) no motion for rehearing is filed within the period allowed for such motions; (2) the agency has ruled on submitted motions for rehearing; or (3) any submitted motions for rehearing have been overruled by operation of law. Tex.Rev.Civ.Stat.Ann. art. 6252-13a, Sec. 16(c), (e) (Vernon Supp.1989)
 
 
 [17]
 Section 503(a)(1)(C) of the NGPA provides:
 (a) General rule.--
 (1) Determination.--If any State or Federal agency makes any final determination which it is authorized to make under subsection (c) of this section for purposes of--
 ....
 (C) applying the definition of new, onshore production well under section 3313(c) of this title;
 ....
 such determination shall be applicable under this chapter for such purposes unless such determination is reversed under the provisions of subsection (b) of this section or unless such State or Federal agency has waived its authority under the provisions of subsection (c) of this section.
 15 U.S.C. Sec. 3413(a)(1)(C). Subsection (b) of the section provides for FERC review of the initial determination. Id. Sec. 3413(b). The RCT is the jurisdictional "State or Federal agency" for section 103 determinations applicable to the petitioners' Panhandle Field wells. See 18 C.F.R. Sec. 274.501(a)(2) (1988).
 
 
 [18]
 Section 503(c)(1) of the NGPA provides:
 (c) State authority.--
 (1) General rule.--A Federal or State agency having regulatory jurisdiction with respect to the production of natural gas is authorized to make determinations referred to in subsection (a) of this section.
 15 U.S.C. Sec. 3413(c)(1). The RCT is the "Federal or State agency" that has regulatory jurisdiction over the production of natural gas by the petitioners' Panhandle Field wells. See 18 C.F.R. Sec. 274.501(a)(2) (1988).
 
 
 [19]
 The NGPA defines the term "proration unit" to mean
 (A) any portion of a reservoir, as designated by the State or Federal agency having regulatory jurisdiction with respect to production from such reservoir, which will be effectively and efficiently drained by a single well;
 (B) any drilling unit, production unit, or comparable arrangement, designated or recognized by the State or Federal agency having jurisdiction with respect to production from the reservoir, to describe that portion of such reservoir which will be effectively and efficiently drained by a single well; or
 (C) if such portion of a reservoir, unit, or comparable arrangement is not specifically provided for by State law or by any action of any State or Federal agency having regulatory jurisdiction with respect to production from such reservoir, any voluntary unit agreement or other comparable arrangement applied, under local custom or practice within the locale in which such reservoir is situated, for the purpose of describing the portion of a reservoir which may be effectively and efficiently drained by a single well.
 15 U.S.C. Sec. 3301(8).
 
 
 [20]
 The NGPA defines the term "reservoir" to mean
 any producible natural accumulation of natural gas, crude oil, or both, confined--
 (A) by impermeable rock or water barriers and characterized by a single natural pressure system; or
 (B) by lithologic or structural barriers which prevent pressure communication.
 15 U.S.C. Sec. 3301(6).
 
 
 [21]
 The NGPA requires that for all Sec. 103 wells the "surface drilling" must have begun "on or after February 19, 1977." 15 U.S.C. Sec. 3313(c)(1)
 
 
 [22]
 An exception to this procedure did exist for "second wells in a proration unit [the drilling of which was begun] after February 19, 1977, and before January 1, 1979, or for which a drilling permit was issued before January 1, 1979." Stowers Oil & Gas Co., 33 FERC p 61,207, at 61,421 n. 36 (1985) (order denying stay and rehearing). That exception was required because of a transitional period during which the regulations implementing the NGPA were not yet in place. Id. None of the petitioners' wells met the requirements of the transitional rules. Id